586 A.2d 936

**Mary C. MILLER, Administratrix of the Estate of John R. Miller, Deceased; and All Others Similarly Situated, Appellants,**

v.

**KEYSTONE INSURANCE COMPANY.**

Superior Court of Pennsylvania.

Argued Jan. 17, 1990.

Filed Jan. 8, 1991.

Reargument Denied March 5, 1991.

214

Richard C. Angino, Harrisburg, for appellants.

A. Richard Feldman, Philadelphia, for appellees.

Before ROWLEY, FORD ELLIOTT and HOFFMAN, JJ.

FORD ELLIOTT, Judge:

Plaintiff/appellant Mary C. Miller, administratrix of the estate of her son, John Miller, who was killed in a motor vehicle accident on August 12, 1980, sought to bring a class action lawsuit to force defendant/appellee Keystone Insurance Company to pay post-mortem work loss benefits pursuant to the now-repealed No-fault Motor Vehicle Insurance Act, Act of July 19, 1974, P.L. 489, No. 176 §§ 101–701, 40 P.S. §§ 1009.101–1009.701 (Supp.1982). Her motion for class certification was challenged by Keystone. In an attempt to ensure that the class would have a representative plaintiff, petitions to intervene and to become additional representative plaintiffs were filed by petitioners/appellants Deborah Steward, Danny Gilbert, Suzanne Shadler, and Phil Sanchez, all of whom were, or had applied to become, administrators of the estates of persons killed in automobile accidents.

In orders entered on May 16, 1989, the trial court granted Keystone's motion for summary judgment as to Mary Mil-

ler's individual claim; denied, on various grounds, all of the petitions to intervene; and denied the motion for class certification, as no representative plaintiff remained to lead the class. Judgment in favor of Keystone was entered on June 2, 1989.

In this timely appeal, appellants contend that the trial court erred in granting summary judgment against Mary Miller, in denying the petitions to intervene, and, consequently, in denying the motion for class certification.

## I.

We turn first to appellants' challenge to the award of summary judgment in favor of Keystone and against Mary Miller. Pursuant to Pa.R.C.P. 1035(b), such a motion is properly granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, along with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In ruling upon such a motion, the court must examine the record in the light most favorable to the nonmoving party and must resolve any doubt against the moving party. The court's function is not to decide issues of fact, but solely to determine whether there is such an issue to be tried. *Washington Federal Savings and Loan Association v. Stein,* 357 Pa.Super. 286, 288–89, 515 A.2d 980, 981 (1986).

John Miller, the son of Mary Miller, was the named insured on a No-fault automobile insurance policy issued by Keystone. Following his death in a motor vehicle accident on August 12, 1980, Keystone paid collision, funeral, and survivor's loss benefits with the last benefits being paid in April, 1982. Work loss benefits were not paid by Keystone and were not sought by Mary Miller until August 11, 1986, when she filed the complaint initiating the present action. In the complaint Mary Miller, as administratrix of her son's estate and representative plaintiff, sought post-mortem work loss benefits, plus interest and counsel fees, "for herself and the class which she represents."

In the opinion accompanying its orders of May 16, 1989, the trial court held that Miller's claim was barred by the statute of limitations as set forth in § 1009.106(c)(1) of the No-fault Act, 40 P.S. § 1009.106(c)(1).[1] In this appeal, appellants do not dispute the trial court's interpretation of the applicable statute of limitations. Instead, they contend that Keystone knowingly misrepresented the benefits due to Mary Miller, thus breaching the duty of "good faith and fair dealing" as announced in *Dercoli v. Pennsylvania National Mutual Insurance Company*, 520 Pa. 471, 554 A.2d 906 (1989). Therefore, since Keystone's knowing misrepresentation was the cause of Miller's failure to bring a timely action to recover post-mortem work loss benefits, appellants argue, Keystone's action should operate to toll the statute of limitations and allow Miller to recover the benefits to which she is entitled.[2] Appellant's *Dercoli* argument is

**1.** Section 1009.106(c)(1) states the following:

> If no-fault benefits have not been paid for loss arising otherwise than from death, an action therefor may be commenced not later than two years after the victim suffers the loss and either knows, or in the exercise of reasonable diligence should have known, that the loss was caused by the accident, or not later than four years after the accident, whichever is earlier. If no-fault benefits have been paid for loss arising otherwise than from death, an action for further benefits, other than survivor's benefits, by either the same or another claimant; may be commenced not later than two years after the last payment of benefits.

**2.** At the outset, we note that some confusion exists as to the exact nature of the issue raised by appellants. In their Statement of Issues Presented, appellants assert that the issue concerns "the benefits due to Mary Miller arising out of the death of her son" (Brief for Appellant at 3). In their brief appellants assert, more precisely, that Keystone failed to inform Miller of the benefits to which she was entitled *as a dependent survivor.* However, as the following excerpts indicate, Miller's complaint reveals that she sought such benefits *on behalf of her decedent's estate:*

> 1. Plaintiff, Mary C. Miller, is the Administratrix of the Estate of John R. Miller....

> . . . . .

> 7. As a result of this accident, plaintiff's decedent's estate has suffered severe losses because decedent's untimely death caused immediate and complete loss of probable future income, which loss

premised on the theory that Keystone breached a duty of good faith and fair dealing to its insured, John Miller's estate, by failing to disclose the estate's entitlement to post-mortem work loss benefits at the time of processing the estate's claim for benefits.

In *Dercoli*, our supreme court reiterated that it has long been the law of this Commonwealth that "the utmost fair dealing should characterize the transactions between an insurance company and the insured." *Dercoli, supra,* 520 Pa. at 477, 554 A.2d at 909, citing *Fedas v. Insurance Company of the State of Pennsylvania,* 300 Pa. 555, 559, 151 A. 285 (1930). Also see *Gray v. Nationwide Mutual Insurance Company,* 422 Pa. 500, 223 A.2d 8 (1966) and *Gedeon v. State Farm Mut. Auto. Insurance Company,* 410 Pa. 55, 188 A.2d 320 (1963). The *Dercoli* court then expanded this duty to require that insurers must deal fairly

is defined as "work loss" under the ... No–Fault ... Act, 40 P.S. § 1009.103.

. . . . .

9. No. written rejection of plaintiff's decedent's estate's claim for no-fault work loss benefits was made by defendant as required by the No–Fault Act, 40 P.S. § 1009.106(a)(5).

. . . . .

12. Plaintiff avers that the defendant misled plaintiff into believing that her decedent's estate had no valid claim for work loss benefits. 13. Plaintiff avers that plaintiff justifiably but detrimentally relied on defendant's misrepresentations of the material fact that her decedent's estate had no valid claim for no-fault work loss benefits. 14. Plaintiff avers that defendant had no reasonable basis to believe that her decedent's estate was not entitled to no-fault work loss benefits in August, 1980, in light of appellate court decisions, including *Heffner* ..., which applied retroactively, and made it clear to defendant that plaintiff's decedent's estate was entitled to no-fault decedent work loss benefits. The relief requested by Miller, "the representative plaintiff, for herself and the class which she represents," included, *inter alia,* ordering Keystone "to immediately pay to each decedent-insured's estate or relatives maximum wage loss benefits, plus eighteen percent accumulated interest to the time of payment...." The trial court understood Miller to have brought the action "on behalf of her son's estate and all others similarly situated ..." (Trial Court Opinion at 1). As appellants did not raise in the trial court the claim that Miller was entitled to recover post-mortem work loss benefits as the *survivor* of a deceased victim, we will not address such a claim in this appeal.

and openly with their insured even though such dealing may be adverse to their own interests.

*Dercoli* involved an automobile accident where the husband-insured fell asleep at the wheel which caused the vehicle to cross over the center-line of a highway and crash into the rear wheels of an oncoming tractor-trailer. The husband was killed instantly and his wife, the claimant, was injured severely. In her claim for insurance benefits, the wife relied solely on the advice of the agents of two separate insurance companies to receive the benefits due her under two separate policies held by her deceased husband.[3] While appellant was still receiving benefits, and relying on the agents for advice, the supreme court decided *Hack v. Hack*, 495 Pa. 300, 433 A.2d 859 (1981), which abolished the defense of interspousal immunity in Pennsylvania as a bar to an action for personal injuries caused by the negligence of the injured victim spouse. Mrs. Dercoli subsequently learned of the applicability of the *Hack* decision to her case some four years later and instituted suit against the insurance carriers averring a breach of good faith and fair dealing for their failure to inform her of her newly created right to benefits following the *Hack* decision. In an opinion announcing the decision of the court, Justice Larsen held "[T]he duty of an insurance company to deal with the insured fairly and in good faith includes the duty of full and complete disclosure as to all of the benefits and every coverage that is provided by the applicable policy or policies along with all requirements including any time limitations for making a claim." *Dercoli, supra,* 520 Pa. at 478, 554 A.2d at 909.

---

**3.** In *Dercoli,* the wife was not seeking benefits as a representative of the estate of her deceased husband but rather in her own right as a claimant. Therefore, the court, by permitting Mrs. Dercoli to recover appears to apply the good faith and fair dealing standard broadly not only to insureds, but to claimants as well. But see *Dercoli v. Pennsylvania National Mutual Ins. Co.,* 369 Pa.Super. 289, 535 A.2d 163 (1987), Opinion by Brosky, J. which though recognizing the duty of insurer to act in good faith in relation to its insured, denied Mrs. Dercoli relief on this basis because of her status as an injured third party and not an insured. We need not concern ourselves with this question as we are dealing with a suit instituted by an insured.

Appellee argues that *Dercoli* should be given no precedential authority because Justice Larsen's opinion, joined in by former Justice Stout, expressed the views of only two justices.[4] However, appellee ignores that the Concurring Opinion, authored by Justice Papadakos, and joined in by Justice McDermott, is consistent with and adds further definition to the holding as enunciated by Justice Larsen. In concurrence, Justice Papadakos, initially disassociated himself from the lead opinion's statement that *Taglianetti v. Workmen's Compensation Appeal Board*, 503 Pa. 270, 469 A.2d 548 (1983), was decided wrongly,[5] however, he specifically concurred in the judgment of the court expressing general agreement with the reasoning set forth in the majority opinion. The thrust of his opinion countered the position taken by the dissent that the court's decision transformed insurance companies into legal service advisors for claimants.

The essence of the duty defined by both Justice Larsen's and Justice Papadakos' opinions is that when the insurer assumed the responsibility to provide Mrs. Dercoli with assistance and advice in securing all available benefits to which she was entitled under the policy, the insurer was required to deal with her in the spirit of good faith and fair dealing. This was so even though informing Mrs. Dercoli of the *Hack* decision was contrary to the insurer's own interests. As stated more succinctly by Justice Larsen:

This is especially true where the insurer undertakes to advise and counsel the insured in the insured's claim for benefits. Under such circumstances, the insurer has a duty to inform the insured of all benefits and coverage that may be available *and of any adverse interest per-*

4. Justice Papadakos filed a Concurring Opinion in which Justice McDermott joined, and Justice Flaherty authored a Dissenting Opinion joined by Chief Justice Nix and Justice Zappala.

5. *Taglianetti* involved a suit by an employee against an employer for the employer's failure to inform the widow of the employee about potential claims and benefits under Workmen's Compensation. Finding no evidence of fraud or intentional misrepresentation, the majority of the court refused to impose such a duty solely based on the employer-employee relationship.

*taining to the insurer's liability under the applicable policy.*

*Dercoli, supra,* 520 Pa. at 4, 554 A.2d at 909. (Emphasis added).

Contrary to appellee's contention, we find the duty enunciated in *Dercoli* to be a logical and rational one which flows from the relationship as it in fact exists between insurers and their insured. In *Dercoli,* Justice Larsen cited the California case of *Sarchett v. Blue Shield of California,* 43 Cal.3d 1, 233 Cal.Rptr. 76, 729 P.2d 267 (1987) as supportive of a finding of a duty on the insurer. We find the language of another California case cited in *Sarchett* equally instructive.

Very recently, in *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 157 Cal.Rptr. 482, 598 P.2d 452, we summarized these principles, noting first that in insurance contracts, as in all contractual relationships, "[i]n addition to the duties imposed on contracting parties by the express terms of their agreement, the law implies in every contract a covenant of good faith and fair dealing. [Citations.] The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. [Citation.] The precise nature and extent of the duty imposed by such an implied promise will depend on the contractual purposes." *Id.,* at 818, 157 Cal.Rptr. at 486, 598 P.2d at p. 456. In *Egan* we also pointed out that in handling claims submitted by its own insured, "[f]or the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the agreement, *[the insurer] must give at least as much consideration to the latter's interest as it does to its own.* [Citation.]" (Emphasis added.) (*Id.,* at 818–819, 157 Cal.Rptr. at p. 486, 598 P.2d at p. 456.)

One important facet of the insurer's obligation to give the insured's interest "as much consideration ... as it does ... its own" is the duty reasonably to inform an insured of the insured's rights and obligations under the

insurance policy. In particular, in situations in which an insured's lack of knowledge may potentially result in a loss of benefits or a forfeiture of rights, an insurer has been required to bring to the insured's attention relevant information so as to enable the insured to take action to secure rights afforded by the policy.

*Davis v. Blue Cross of Northern California,* 25 Cal.3d 418, 158 Cal.Rptr. 828 at 833–34, 600 P.2d 1060 at 1065–66 (1979).[6]

■ We are mindful of the dissent by Justice Flaherty in *Dercoli,* which suggests that "[i]t has always been the case that insurance companies, insureds and claimants are potential adversaries." *Dercoli, supra,* 520 Pa. at 483, 554 A.2d at 912. While the potential for conflict may always be present, we agree with appellant herein, that insurers when selling insurance or representing their insured in court do not present themselves in an adversarial light. Can there be any doubt about this when in soliciting business, the consumer is persuaded that insurers are "on their side" and that they are "in good hands." It should be stated that most insurance agents and brokers approach their relationship with their insured in this spirit of cooperation and trust. Therefore, is it so great a duty to impose on an insurer that if the potential for an adversarial relationship exists, it is under an obligation to so advise its own insured. And failing to do so, may not an insurer be held to have breached an affirmative duty imposed by its contract of insurance of good faith and fair dealing.

The imposition of the duty in *Dercoli* was premised on three factors: (1) the insurer had assumed the responsibility for processing its insured's claims; (2) the insurer knew that the insured was relying exclusively on its advice and counsel; and, (3) the insurer had knowledge regarding an additional claim for benefits to which Mrs. Dercoli was entitled and it failed to disclose such information.

**6.** See generally, Barker, *The Scope of the Emerging Duty of First–Party Insurers to Inform Their Insureds of Rights Under the Policy,* 25 Tort and Insurance Law Journal, No. 4 at 749 (1990).

Having so defined the duty in *Dercoli*, we must now decide whether evidence exists in the instant case, that Keystone was under a duty to inform Mrs. Miller of any information of which it had knowledge regarding recovery of post-mortem work loss benefits by the estate of her son at some time before the Statute of Limitations ran on the estate's claims.

We first look to whether Keystone assumed the responsibility for processing the claims of its insured's estate. In *Dercoli*, it was significant that the insurer had undertaken to advise and counsel the insured in the insured's claim for benefits. Keystone would argue that *Dercoli* should be limited to those situations when an insurer volunteers to act as legal counsel for its insured. We disagree. If the duty on an insurer can be imposed only because it assumes the role of legal advisor, then that duty should rise to a level much greater than good faith and fair dealing.

As stated by Justice Papadakos in his concurrence in *Dercoli:*

> After all, the law does not favor a volunteer. It is simple black letter law that where one gratuitously undertakes *to render legal or other services* and then does so in a careless or negligent way, causing harm, liability attaches.

*Dercoli, supra,* 520 Pa. at 482, 554 A.2d at 911. (Emphasis added). Although we recognize in the instant case that Keystone's agent did not specifically inform Mrs. Miller that he would obtain for the estate all to which it was entitled, we find this responsibility implicitly imposed upon Keystone and its agent by the No-fault Act itself. It is very significant that one of the primary purposes of the No-fault Act was to insure that a claimant would not need an attorney to secure basic benefits, and to this end, the burden was placed on the insurer to investigate and pay claims. The scheme of the Act encouraged claimants to place their trust and reliance in their insurance companies to see to it that their claims would be handled properly, and that they would receive *all to which they were entitled*

*under the Act.*[7]   A necessary corollary of this reliance was that insurers would handle and process claims in good faith and in the best interests of the claimant in a nonadversarial relationship.   Additionally, there is at least some evidence in the instant case that Keystone voluntarily assumed the processing of Mrs. Miller's claim in that it is alleged that the statement of benefits which was submitted by Mrs. Miller actually was prepared by an agent of Keystone.

    However, our inquiry does not end here.  *Dercoli* also requires that before a duty may be imposed on the insurer, the insurer must know that the insured is acting in reliance upon its advice and counsel.  We find it an important consideration in the imposition of the *Dercoli* duty that an insured not be represented by legal counsel in the processing of the claims.   It is implicit in imposing the *Dercoli* duty that an insurer in counseling an unrepresented insured recognize that its level of information is most likely greater than that of the insured.   Not only are insurers at an advantage in terms of differing legal interpretations on coverage issues, but insurers have the additional benefit of their own legal counsel when processing claims.  Instantly, it is alleged in appellant's complaint that counsel was retained sometime after the processing of the estate's claims. It is for the appellant to establish on remand that she was unrepresented at the relevant time in question and that Keystone had knowledge of this and knew that she was relying on its agent's advice.

    We now turn to the third prong of the *Dercoli* duty defined herein as to whether there is any evidence that Keystone had information regarding additional benefits to which the Miller estate was entitled and it failed to disclose such information prior to the claim being time barred. Specifically, did Keystone have a duty to disclose to Mrs.

7.  Contrary to appellee's argument and assuming that the insured has supplied all necessary information to its insurer for the processing of claims, it logically follows that an insured does not need to make a specific demand for services or benefits to which the insured is entitled.

Miller that the estate should present a claim for post-mortem work loss benefits?

Appellee cites this court's decision in *Gabovitz v. State Auto. Ins. Assn.*, 362 Pa.Super. 17, 523 A.2d 403 (1987) as controlling on this issue. However, we find *Gabovitz* to be distinguishable factually and to some degree repudiated by *Dercoli*. Like the case herein, *Gabovitz* involved a class action suit instituted by the executrix on behalf of her deceased husband's estate and those similarly situated to recover post-mortem work loss benefits under the No–fault Act. But this is where the similarity ends.

The factual basis of the appeal to this court from the grant of summary judgment in favor of State Auto was as follows.

Albert Gabovitz sustained fatal injuries in a motor vehicle accident on February 18, 1976. He was insured pursuant to a policy of no-fault insurance which had been issued by State Auto. In April of 1976, Juliana Gabovitz, acting as executrix of her deceased husband's estate, filed a claim with State Auto to recover funeral and survivor's benefits. These were promptly paid by State Auto. Over four years later, on November 26, 1980, Gabovitz caused a letter to be sent to State Auto demanding payment of work loss benefits. State Auto denied this claim. Consequently, on December 1, 1980, Gabovitz commenced an action on behalf of her decedent's estate to recover work loss benefits from State Auto. Later, on June 22, 1982, she filed a class action seeking recovery of post-mortem work loss benefits on behalf of her husband's estate and also on behalf of the estates of all insureds of State Auto who had died in automobile accidents following passage of the No-fault Act.

*Gabovitz, supra,* 362 Pa.Super. at 20, 523 A.2d at 404–05.

Mrs. Gabovitz argued to this court that State Auto should be estopped equitably from asserting the defense of statute of limitations because the insurance company induced her to refrain from filing her action within the time allowed. The panel denied Mrs. Gabovitz' relief on appeal finding that

without "expressly proved fraud, there can be no estoppel based on the acts or conduct of the party sought to be estopped, where they are as consistent with honest purpose and with absence of negligence as with their opposites." *Gabovitz, supra,* 362 Pa.Super. at 23, 523 A.2d at 406 citing *In re Tallarico's Estate,* 425 Pa. 280, 288, 228 A.2d 736, 741 (1967). The court found no support in the record for Mrs. Gabovitz's allegation that State Auto had made oral representations that post-mortem work loss benefits were not recoverable and that even if agents of State Auto had made such representations, they would have represented nothing more than expressions of legal opinion. We agree with this analysis by our colleague, Judge Wieand. In 1976, when the estate's claim was processed by State Auto there was no allowable recovery of post-mortem work loss benefits. Even the *Dercoli* duty to inform would not require an insurer to anticipate future developments in the law or to predict future entitlements to benefits. It is fair to posit that the *Dercoli* court would not have imposed a duty on the insurer to have anticipated the *Hack* decision. Rather it is because *Hack* was decided while Mrs. Dercoli's claims still were being processed that the insurer had an affirmative duty to inform her that she was entitled to an additional claim for benefits or at least that their relationship had become adversarial. Under the facts of *Gabovitz,* the estate's claim for post-mortem work loss benefits was time barred by April, 1980, even before the Pennsylvania Supreme Court decided the *Heffner, infra,* and *Pontius, infra,* cases. In 1976, without proof of more, the insured and insurer had equal information regarding whether post-mortem work loss benefits someday would be recoverable by an estate.

Appellee herein cites *Gabovitz* for the additional proposition that there is no affirmative duty to inform imposed by the No-fault Act. However, we find that such a broad reading of *Gabovitz* is inappropriate. In context, Judge Wieand stated the following.

The final ground asserted by Gabovitz in support of her equitable estoppel argument concerns the failure of State Auto to give her formal notice in April of 1976 that it would not pay her post-mortem work loss benefits. She concedes that she did not request payment of such benefits until November of 1980. *Nevertheless, she argues, State Auto had an affirmative duty to inform her, at the time she filed her original claim for benefits in April of 1976, of all possible benefits, including those which were not then recognized.* We reject this argument. No such duty was imposed upon insurers by the No-fault Act, and we decline to recognize such an obligation here. To do so would impede rather than expedite the processing of no-fault insurance claims and, in so doing, would violate one of the primary objectives of the No-fault Act. Neither fraud nor deception can be implied merely because an insurance company awaited a specific demand for post-mortem work loss benefits before giving formal notice to its insured that such benefits would not be paid.

*Gabovitz, supra,* 362 Pa.Super. at 25, 523 A.2d at 407. (Emphasis added). We are in agreement that no duty should have been imposed on an insurer in 1976, to anticipate the *Heffner, Pontius* and *Freeze, infra,* decisions. Moreover, under the duty we impose today, we would reach the same conclusion as did the court in *Gabovitz.*[8]

■ However, we find that the instant case presents a very different factual context than that found in *Gabovitz.* Based on the evidence admitted below, there would appear to be a stronger argument that in 1980 when the Miller estate claims were being processed, or even more definitely prior to the estate's claims being barred, Keystone was on notice that post-mortem work loss benefits were subject to recovery by an insured's estate.

8. Additionally, appellee cites this court to *Jones v. Keystone Ins. Co.,* 364 Pa.Super. 318, 528 A.2d 177 (1987). We find no application of the holding in *Jones* to the instant case.

On September 22, 1980, prior to the Miller estate's claims being processed, our supreme court decided the companion cases of *Allstate Insurance Company v. Heffner* and *Pontius v. United States Fidelity and Guaranty Company*, 491 Pa. 447, 421 A.2d 629 (1980). *Heffner* concerned a claim for work loss benefits brought by the survivor of a deceased victim. The trial court granted judgment on the pleadings in favor of the insurer, and this court reversed. *Heffner, supra*, 265 Pa.Super. 181, 401 A.2d 1160. *Pontius* concerned a claim for work loss benefits brought by the administrator of a deceased victim's estate. The trial court sustained the insurer's preliminary objections in the nature of a demurrer, and this court, in an unreported and non-precedential decision, reversed. The supreme court affirmed the orders of this court in both cases. *See* 491 Pa. 447, 421 A.2d 629.

It cannot be denied that the insurance industry in this Commonwealth was aware fully of the appellate activity on these interpretive issues under the No-fault Act in 1980. In fact, the supreme court in the *Heffner* and *Pontius* appeals had the benefit of amicus briefs from the Pennsylvania Trial Lawyers, filed on behalf of the appellee Heffner, and from the Insurance Federation of Pennsylvania, the National Association of Independent Insurers, and the American Insurance Association, filed on behalf of both Allstate and United States Fidelity and Guaranty Company.

We find more specifically, that an internal memorandum written on October 21, 1980, by an adjuster working for Keystone to the claims representative, regarding the nature of information disclosed to Mrs. Miller, is at least some evidence, that Keystone was aware of the changing law in this area. This memorandum read as follows:

As you have indicated in our telephone conversation of 10–20–80 that Mary Miller (mother of the deceased insured) would be entitled to survivors benefits which according to your Philadelphia office would involve a monthly check of $135.00 until the $5,000 survivors benefit is exhausted we have notified Mrs. Miller that she will

be receiving monthly payments shortly in that regard. In addition, we made no mention to Mrs. Miller as discussed pertaining to possible benefits for lost wages and will merely await developments in that regard.

We find the interpretation and effect of this memorandum a matter for the trier of fact.[9]

The issue of viability of the estate's claim for benefits was put to rest by this court's subsequent decision in *Freeze v. Donegal Mutual Ins. Co.*, 301 Pa.Super. 344, 447 A.2d 999 (1982.) In its argument to this court in *Freeze*, the insurer requested that this court repudiate the language in *Heffner* as it might be applied to an estate's entitlement to work loss benefits. Discussing the impact of the supreme court's affirmance in the *Pontius* case, then President Judge Cercone, who also authored this court's decision in *Heffner*, stated:

[s]trictly speaking the foregoing quotation was dictum to our opinion in *Heffner v. Allstate Ins. Co.* since the plaintiff in that case was the deceased victim's widow and not the estate. However, the plaintiff in *Pontius* was the administrator of the deceased victim's estate. In reversing the lower court's decision in our order filed in *Pontius* we relied on our opinion in *Heffner v. Allstate Ins. Co.* Our Supreme Court never directly addressed the question of whether a deceased victim's estate may recover under the No-fault Act, however, it did affirm both our decision in *Heffner v. Allstate Ins. Co.* and our order in *Pontius*. Furthermore, the Supreme Court adopted much of our opinion in *Heffner v. Allstate Ins. Co.* as its own. From

9. Appellee argues in its brief that this memorandum was inadmissible as work product and privileged under Pa.R.C.P. 4003.3 since it contains the adjuster's mental impressions, conclusions or opinions respecting the value and merit of a claim or defense or respecting strategy or tactics. Although we decline to make an evidentiary ruling concerning the insurer's internal memorandum on appeal, we do believe that it could be admitted properly at trial concerning the issue of when the insurer had knowledge of an estate's right to post-mortem work loss benefits. Pa.R.C.P. 4003.1—4003.3; 6 Standard Pennsylvania Practice 2d § 34:28, § 34:31; *See also Nedrow v. Pa. Nat. Mut. Cas. Ins. Co.*, 31 Pa.D. & C.3d 456 (1981); *Pile v. Nationwide Mut. Ins. Co.*, 35 Som.Leg.J. 326 (1978); *Whitehead v. Allstate Ins. Co.*, 3 Pa.D. & C.3d 56 (1977).

the tenor of the Supreme Court's opinion in *Allstate Ins. Co. v. Heffner, supra,* and from its affirmance sub silentio in that case of our decision in *Pontius* that a deceased victim's estate may recover under the Act, we conclude that what was dictum in our earlier opinion must properly be applied to this case and become our holding.... There, we termed the result advocated by the insurance company "untoward" and "legislatively unintended." *Id.* We are no less convinced of the correctness of our position in *Heffner v. Allstate Ins. Co.* today than we were two years ago. Indeed, in light of *Allstate Ins. Co. v. Heffner, supra,* we stand the firmer yet behind our conviction that the Legislature intended no such result. We hold today that the estate of a deceased victim is entitled to recover work loss benefits under the No-fault Act.

*Freeze, supra,* 301 Pa.Super. at 353–54, 447 A.2d at 1004.

The supreme court affirmed this court's holding on the entitlement of an estate to post-mortem work loss benefits in an opinion filed December 30, 1983, describing the result as a "natural, logical and compelling extension of our holding in *Heffner*." *Freeze v. Donegal Mutual Insurance Company,* 504 Pa. 218, 222, 470 A.2d 958, 960 (1983).

It is noted at this point that this court's decision in *Freeze* was filed just three months after Mrs. Miller received her last benefits and a full year before the estate's claims would have been time barred. However, the question before this court on the imposition of the *Dercoli* duty is not whether Keystone's insureds were able to recover between the *Heffner–Pontius* cases and the *Freeze* decisions but rather whether Keystone had an obligation to inform its insureds that it had knowledge of the potential for such recovery, and that it was no longer acting in the interests of its unrepresented insureds in this matter. As noted earlier, Keystone's own internal memorandum is strong evidence of its decision not to disclose this fact. Although broader in scope than the question we face today, there may be some analogy to this case in the reasoning of Senior Judge

Vanartsdalen, in *Kromnick v. State Farm,* No. 85–5824, slip op. at 57–58, 1990 WL 1407 (E.D.Pa. Jan. 10, 1990).
State Farm argues that until the *Freeze* decision in 1983, there was no binding caselaw from the Pennsylvania Supreme Court requiring payment of post mortem work loss benefits to decedent's estates, and therefore it should not be held liable to a duty not yet announced. The short answer to that argument is that there was no caselaw to the contrary. *Freeze* did not change the law of Pennsylvania. It merely decided what the statute had always required. State Farm, and all other insurers who may have acted similarly, merely relied upon their own interpretation of the statute, which was determined by *Freeze* to be a totally incorrect interpretation. State Farm made conscious and deliberate decision to say nothing to claimants about possible work loss benefits so as "not to agitate or aggravate" claimants.... In other words, State Farm took the risk in the hope that by the time a claimant might become aware of a right to claim, it would be time barred.... Finally, it may be contended that the *Dercoli* doctrine of advising claimants of potential claims should not be made retroactive. However, *Dercoli* itself considers the retroactivity of *Hack v. Hack* and concludes nevertheless that *Hack v. Hack* should operate retroactively so as to remove the bar of the statute of limitations. I predict that the Supreme Court of Pennsylvania would conclude that *Dercoli* should apply retroactively when the effect would be to toll the statute of limitations because of the failure of State Farm to timely advise claimants of their right to work loss benefits.

In conclusion, we agree with appellant that there is at least some evidence for the imposition of the *Dercoli* duty of good faith and fair dealing in this case; therefore, we vacate the summary judgment entered below. However, we recognize that since *Dercoli* was decided after presentation of appellant's claim to the trial court, and prior to the filing of this appeal, the trial court has not had an opportunity to consider this issue. Therefore, our reversal today is

not a reflection of that court's disposition of the statute of limitations question. But for allegations of a breach of good faith and fair dealing as enunciated in *Dercoli*, the instant case would be time barred. Also, it is on this basis that we will not find waiver of the duty of good faith issue. In her complaint, Mrs. Miller, at all times contended that Keystone withheld information; therefore, the factual basis for the breach of duty claim has been pled sufficiently.

## II.

We next consider the trial court's denial of the petitions to intervene of Deborah Steward, Suzanne Shadler, Danny Gilbert, and Phil Sanchez. The trial court considered each of the four petitions to intervene separately on its merits.

The trial court denied the petition to intervene of Deborah Steward. The trial court found that the Steward claim was time-barred.

The trial court denied the petition to intervene of Suzanne Shadler. The court found that the petitioner failed to establish that she was an "insured" as the term is utilized in the class definition and therefore had failed to sustain her burden of proving all of the allegations as set forth in her petition. The court also found that, in any event, her claim was time-barred.

The trial court denied the petition to intervene of Danny Gilbert. The trial court found that the petitioner failed to establish that the decedent had not already received full No-fault work-loss benefits and as such did not sustain his burden of proving all of the allegations set forth in his petition to intervene.

The trial court denied the petition to intervene of Phil Sanchez. The court based its decision on multiple grounds, including: (1) the action was barred by the doctrine of *lis pendens;* (2) the petitioner failed to sustain his burden of proving all of the allegations set forth in his petition to

intervene in that he did not establish that decedent was an "insured" as the term is utilized in the class definition; and, in any event, (3) had the petition to intervene been adequately supported, refusal of permission to intervene would have been justified pursuant to Pa.R.C.P. 2329(2) since the petitioner's interest were already adequately represented.

Petitioners timely filed this appeal to the above orders. On appeal, appellants allege that the trial court erred in denying the above petitions.[10]

We first consider this court's role in reviewing the denial of the petitions to intervene filed by Steward, Shadler, Gilbert and Sanchez.

The initial issue to be decided is whether the orders denying the petitions were final and therefore appealable. If they are not, the appeals must be quashed. The decision as to whether to quash an appeal as interlocutory is often done without reference to the merits of the case since many orders, by their very nature, lack any indicia of finality. However, in some cases, including the one which we now consider, the decision whether to quash is intertwined with a consideration of the merits. This is due to the fact that the "finality and therefore the appealability of the orders is a judicial conclusion which can be reached only after an examination of its ramifications." *Richards v. Trimbur*, 374 Pa.Super. 352, 358, 543 A.2d 116, 119 (1988) (citations omitted). The rule used to determine the appealability of orders denying a petition to intervene is well established in

10. At this juncture, we note a procedural defect in this appeal which appellee argued in a motion to quash subsequently denied by this court on December 5, 1989. Counsel for appellants filed only one notice of appeal, listing all appellants at No. 304 Hbg.1989, from the May 16, 1989 order of the trial court. This is in violation of Pa.R.A.P. 512. This is not a *joint appeal*. The trial court entered separate orders denying each petitioner-appellant's motion to intervene on different grounds. A separate appeal was required to be filed by each petitioner-appellant and the appeals would have been subject to consolidation for briefing and argument under Rule 513. However, this court may refrain from quashing on the basis of this defect on our own discretion. *See General Electric Credit Corporation v. Aetna Casualty and Surety Company*, 437 Pa. 463, 263 A.2d 448 (1970).

Pennsylvania.[11]  The Pennsylvania Supreme Court has stated:

> '[A]s a rule an appeal will not lie from an order refusing leave to intervene, because such an order is not a final one [but] cases may arise where a denial of a petition to intervene would be a practical denial of relief to which the petitioner for intervention is entitled and can obtain in no other way;  and in such cases the refusal to permit an intervention is a final order or decree as to the petitioner. *Frey's Estate,* 237 Pa. 269, 271, 85 A. 147, 148 (1912).' (citations omitted).

*Scharnitzki v. Bienenfeld,* 368 Pa.Super. 610, 611, 534 A.2d 825, (1987);  *See also Boise Cascade Corporation v. East Stroudsburg Savings Association,* 300 Pa.Super. 279, 281, 446 A.2d 614, 615 (1982), quoting *Frey's Estate,* 237 Pa. 269, 271, 85 A. 147, 148 (1912).  It is the examination of the merits which determines whether there has been a practical denial of relief.

The trial court concluded that appellants either were not parties to the class action or in the alternative were not parties entitled to relief.  If, upon an examination of the merits, we determine the trial court was correct, the order appealed from is not final as to the parties and therefore not appealable.  We now turn to the merits of appellants' petitions to intervene.

### III.

The determination of who may intervene in an action and when that intervention may be prohibited is determined by Pa.R.C.P. 2327 and 2329.  Rule 2327 states:

> At any time during the pendency of an action, a person not a party thereto shall be permitted to intervene therein, subject to these rules if—

---

**11.**  The propriety of such rules governing interlocutory appeals is established by Pa.R.A.P. 311(a)(7).

(1) the entry of a judgment will impose any liability upon such person to indemnify in whole or in part, the party against whom judgment may be entered; or

(2) such person is so situated as to be adversely affected by a distribution or other disposition of property in the custody of the court or an officer thereof; or

(3) such a person could have joined as an original party in the action or could have been joined therein; or

(4) the determination of such action may affect any legally enforceable interest of such person whether or not he may be bound by a judgment in the action.

However, even if a petitioner fulfills the requirements of Rule 2327, they can be excluded from intervening in the suit by a showing that they fall into one of the three categories set forth in Pa.R.C.P. 2329, which reads as follows:

Upon the filing of the petition and after hearing, of which notice shall be given to all parties, the court, if the allegations of the petitions have been established and are found to be sufficient, shall enter an order allowing intervention; but an application for intervention may be refused, if

(1) the claim or defense of the petitioner is not in subordination to and in recognition of the propriety of the action; or

(2) the interest of the petitioner is already adequately represented; or

(3) the petitioner has unduly delayed in making application for intervention or the intervention will unduly delay, embarrass or prejudice the trial or the adjudication of the rights of the parties.[12]

The cases of the four petitioners will be addressed *seriatim.*

---

**12.** For a more detailed exploration on the relationship between Rules 2327 and 2329 including the burden of proof issues, *See Egenreider, et al. v. The Ohio Casualty Group, et al.,* No. 327 Harrisburg 1989 (filed October 16, 1990.)

## A. Deborah Steward

Deborah Steward is the personal representative of the estate of her deceased husband, Robert Steward, who was killed in a motor vehicle accident on July 17, 1981. Robert Steward was insured under a No-fault policy issued by Keystone. The trial court noted in its opinion that Keystone paid funeral benefits, survivor's loss benefits, and some amount of work loss benefits to Steward. The last of these payments was made December 3, 1982. As the trial court explained, our supreme court held, in *Sachritz v. Pennsylvania National Mutual Casualty Insurance Company,* 500 Pa. 167, 455 A.2d 101 (1982), that work loss benefits arise "otherwise than from death." Because Steward had received payments "for loss arising otherwise than from death," 40 P.S. § 1009.106(c)(1) of the No-fault Act, specified that she had two years after the last payment of those benefits within which to bring a claim for additional work loss benefits. Steward's claim for additional work loss benefits was not brought until August 8, 1988, when she filed her petition to intervene in the action brought by Mary Miller. Therefore, the trial court held that her claim was barred by the statute of limitations.

Appellants contend that the trial court's holding was based on an erroneous reading of the supreme court's opinion in *Sachritz.* To the contrary, it is appellants who have misread the opinion. The supreme court in *Sachritz* did not say that only *pre-death* work loss benefits arise otherwise than from death. Instead, the court explicitly stated that "post-mortem" work loss benefits "arise 'otherwise than from death,' specifically from the work loss resulting from the effects of the covered injury, for which benefits are not terminated by death under *Heffner.*" *Id.,* 500 Pa. at 171, 455 A.2d at 103–4. Accordingly, the trial court's interpretation of the statute of limitations was correct.

Appellants maintain that even if Steward's claim was governed by a two-year statute of limitations, the limitations period was tolled by the minority of Steward's daughter, who was eleven years old when her father died. Sec-

tion 1009.106(c)(5) of the No-fault Act, 40 P.S. § 1009.106(c)(5), provides that if a person entitled to no-fault benefits is under a legal disability when the right to bring an action for such benefits first accrues, the period of disability will be excluded from the limitations period. In support of their claim, appellants cite this Court's opinion in *Patterson v. Nationwide Mutual Insurance Company*, 358 Pa.Super. 167, 516 A.2d 1235 (1986), *alloc. denied*, 515 Pa. 582, 527 A.2d 543 (1987), for the proposition that "the minority of a dependent survivor is such a legal disability as to toll the statute of limitations." (Brief for appellants at 32).

The trial court held, and Keystone argues in this appeal, that "the daughter's minority tolls the statute as to *her* claim, but does not affect the estate's claim, the claim presently at issue" (Trial Court Opinion at 12 n. 6; emphasis in original). We agree. In *Patterson v. Nationwide, supra*, this Court held that the plaintiff/appellee, the minor daughter of an individual killed in a motor vehicle accident, was entitled to recover work loss benefits in her capacity as the decedent's survivor and that the statute of limitations applicable to her action to recover such benefits had been tolled by her minority. *Id.*, 358 Pa.Superior Ct. at 175–77, 516 A.2d at 1240–41. There is no suggestion in the opinion that the daughter's minority would also operate to toll the statute of limitations applicable to an action for work loss benefits brought on behalf of her deceased father's estate. As this court has observed in a somewhat different context, "the distinction [between the status of 'survivor' and the status of 'representative of an estate'] is quite real and must be assiduously protected." *Billman v. Pennsylvania Assigned Claims Plan*, 355 Pa.Super. 524, 534 n. 9, 513 A.2d 1046, 1051 n. 9 (1986) (*en banc*), *alloc. denied*, 515 Pa. 571, 527 A.2d 533 (1987).

Finally, appellants object to "[t]he Trial Court's limitation of this case to recovery for estates" (Brief for Appellant at 34). The complaint filed by Mary Miller is not so limited, appellants assert, but instead defines the class as including

"all persons who have not recovered full work loss benefits, full interest, and attorney's fees through Court-approved settlements" (Brief for Appellant at 33). Appellants note that the relief sought in the complaint included ordering Keystone to pay maximum wage loss benefits plus interest "to each decedent-insured's estate or relatives" and, in the future, to pay promptly for wage loss benefits "for decedents." They contend that the class description and the phrases "estate or relatives" and "for decedents", as well as "the judicial economy that class actions foster" (Brief for Appellants at 33–34), militate against limiting the class to estates.

Appellants' argument is not persuasive. We note, first, that appellants' assertion that the class includes *all persons* who have not recovered work loss benefits, interest, and attorney's fees is a misstatement. As stated in the complaint, the class includes "*all insureds of defendant* who were covered by the Pennsylvania No–Fault Act with respect to *their* fatal injuries" (emphasis added). By choosing this language, appellants have indicated that it is the insureds (i.e., the decedents), and not their survivors, who constitute the class. "A personal representative in the person of the executor or administrator of [the] estate stands in the shoes of the deceased victim as far as entitlement to benefits is concerned." *Freeze, supra,* 504 Pa. at 224, 470 A.2d at 961. *See also Billman v. Pennsylvania Assigned Claims Plan,* 355 Pa.Super. at 533, 513 A.2d at 1050 (survivor, unlike an estate, does not stand in shoes of a deceased victim).

In addition, as noted in Part I of this opinion, the complaint avers that Mary Miller is the administratrix of the estate of John R. Miller; that "plaintiff's decedent's estate has suffered severe losses"; that Keystone gave no written rejection of "plaintiff's decedent's estate's claim for no-fault work loss benefits"; that Keystone "misled plaintiff into believing that her decedent's estate had no valid claim for work loss benefits"; and that Keystone had no reasonable basis for believing that plantiff's decedent's estate was not

entitled to no-fault work loss benefits in light of the *Heffner* decision, which made it clear that the estate was entitled to recover such benefits. With regard to the class as a whole, the complaint avers that the "question of law or fact raised in the instant action are common to all members of the class" and that the claims of Miller as representative plaintiff are typical, if not identical, to the claims of the class. We note also that each of the would-be intervenors is described in his or her petition to intervene as being, or having filed an application to become, the personal representative of the estate of the decedent, and each avers that Keystone misled him or her into believing that the decedent's estate had no valid claim for work loss benefits.

We conclude, therefore, that it is not the trial court but appellants themselves who, in drafting the complaint and the petitions to intervene, have limited the case to estates. The trial court merely accepted the definition of the class that had been chosen by appellants. We agree with its determination. *See Egenrieder v. Ohio Casualty Group,* 365 Pa.Super. 400, 529 A.2d 1118 (1987) (for purpose of determining tolling effect of prior class action, court will not expand scope of plaintiff class in prior action beyond definition given in complaint in prior action).

Accordingly, following a review of the merits of Steward's petition, it is denied.

### B.   Suzanne Shadler

█   Suzanne Shadler is the administratrix of the estate of Jeffrey Miller, who was killed in a motor vehicle accident on September 11, 1981. Miller was the father of Shadler's minor child. The car Miller had been driving was owned by Shadler's mother, to whom Keystone had issued a policy of automobile insurance pursuant to the No-fault Act. The trial court denied Shadler's petition to intervene on the grounds that Miller was not a member of the class of "insureds" and that Shadler's claim was barred by the statute of limitations.

As noted in our discussion of Deborah Steward's petition to intervene, the class action allegations in appellants' complaint averred that the class of plaintiffs "includes *all insureds* of defendant who were covered by the Pennsylvania No-fault Act with respect to their fatal injuries...." (Emphasis added). In the definitions section of the No-fault Act, "insureds" is defined as follows:

(A) an individual identified by name as an insured in a contract of basic loss insurance complying with this act; and

(B) a spouse or other relative of a named insured, a minor in the custody of a named insured, and a minor in the custody of a relative of a named insured if—

(i) not identified by name as an insured in any other contract of basic restoration insurance complying with this act; and

(ii) in residence in the same household with a named insured.

An individual is in residence in the same household if he usually makes his home in the same family unit, even though he temporarily lives elsewhere.

40 P.S. § 1009.103. Appellants do not dispute the trial court's ruling that Jeffrey Miller was not an "insured" within the meaning of the No-fault Act. They contend, however, that the term was used in the class action complaint in accordance with its general usage and meaning, i.e., "one covered by insurance," and that Miller, and therefore Shadler fell within the ambit of the term as so defined.

It cannot be argued that the class action complaint was drafted without knowledge of the definitions provided in the No-fault Act, since, as the trial court noted in its discussion of Phil Sanchez's petition to intervene, "[appellants'] counsel is well acquainted with the no-fault post-mortem work loss benefits class action processes" (Trial Court Opinion at 10). Therefore, it is more reasonable to assume that appellants intended the term "insured" to have the meaning specified in the Act than it is to assume that they intended it to have a different meaning which they left unspecified.

The conclusion is bolstered by the Act's provisions for the payment of benefits to uninsured accident victims. Section 1009.204(a) of the No-fault Act provides that "[t]he security for the payment of basic loss benefits applicable to an injury to: .... (3) the driver or other occupant of a motor vehicle involved in an accident resulting in injury who is not an insured is the security covering such vehicle...." 40 P.S. § 1009.204(a). As Jeffrey Miller, at the time he sustained his fatal injury, was an uninsured individual who was driving a car insured under a policy issued by Keystone, any obligation of Keystone to pay basic loss benefits to Miller would have to be based upon this provision of the Act. Appellants' argument, therefore, would require us to hold that Miller is to be considered an *uninsured* for the purpose of entitlement to basic loss benefits pursuant to § 1009.204(a)(3) and an *insured* for the purpose of participation in the class action lawsuit. We consider it more reasonable to hold that Miller was not a member of the class as defined by appellants. For this reason, we agree with the trial court's denial of Suzanne Shadler's petition to intervene was, for that reason, proper. Our resolution of this issue makes it unnecessary for us to consider the statute of limitations applicable to Shadler's petition. The Petition to Intervene is thus denied.

### C. Danny Gilbert

■ Danny Gilbert is the administrator of the estate of his brother, Brian Gilbert, who died in a motor vehicle accident on November 23, 1984. On December 17, 1984, Keystone paid Brian Gilbert's estate $5,000 in survivor's loss benefits. Keystone subsequently concluded that it was not obligated to pay such benefits because the required proof of the survivor's dependency on the victim had not been received. Therefore, Keystone decided to treat the survivor's loss payment as part of its admitted obligation to pay $15,000 in work loss benefits. The Company subsequently paid an additional $10,000 in work loss benefits. The trial court, after pointing out that, in any event, it is

the survivor and not the estate who would be entitled to survivor's loss benefits, denied Gilbert's petition to intervene on the ground that the Gilbert estate had already received the $15,000 in work loss benefits owed to it.

Appellants contend that Keystone still owes $5,000 in work loss benefits to the Gilbert estate. They argue that the payment of $5,000 in survivor's loss benefits was proper under then-existing case law and, further, that a "setoff" of survivor's loss benefits against work loss benefits is prohibited by § 1009.106(e) of the No-fault Act, which states that "[e]xcept as otherwise provided in this Act, basic loss benefits shall be paid without deduction or setoff." 40 P.S. § 1009.106(e).

Both prongs of appellants' argument are incorrect. In *Chesler v. Government Employees Insurance Company*, 503 Pa. 292, 469 A.2d 560 (1983), *judgment modified on other grounds*, 504 Pa. 426, 475 A.2d 102 (1984), our supreme court held that "section 103 of the Act, 40 P.S. § 1009.103, requires a 'child, parent, brother, [or] sister' of a deceased victim of an automobile accident to show dependency on the victim as a condition of eligibility for survivor's loss benefits." *Id.*, 503 Pa. at 294, 469 A.2d at 560. As *Chesler* was decided on December 30, 1983, almost one year prior to Keystone's payment of $5,000 in survivor's loss benefits, it is apparent that since Keystone had not received proof of dependency, the payment in question was not required by then-existing case law.

Nor can the subsequent crediting of the $5,000 in survivor's loss benefits to Keystone's undisputed obligation to pay $15,000 in work loss benefits be considered an impermissible "setoff." Although the No-fault Act does not define the term, we note, as did the trial court, that the term has been defined in case law as a "counter-claim demand which defendant holds against plaintiff, arising out of a transaction extrinsic of plaintiff's cause of action". *M.N.C. Corporation v. Mount Lebanon Medical Center, Inc.*, 510 Pa. 490, 495, 509 A.2d 1256, 1259 (1986), [*quoting Black's Law Dictionary* 1230 (rev. 5th ed. 1979) ]. Keystone's treatment

of the initial payment of $5,000 does not qualify as a "setoff" as so defined. *See also D.P. "Herk" Zimmerman, Jr., Inc. v. Workmen's Compensation Appeal Board (Himes)*, 103 Pa.Cmwlth. 68, 519 A.2d 1077 (1987) (§ 106 of No-fault Act provides that obligator/insurer is entitled to reimbursement from claimant who receives payments to which he or she was not entitled).

To allow the Gilbert estate to retain the sum of $5,000 erroneously paid as survivor's loss benefits, as well as the initial $10,000 in work loss benefits, and to receive in addition another $5,000 in work loss benefits, would be to award the estate a windfall of $5,000 to which it is not entitled. Accordingly, we agree with the trial court that the Gilbert estate has already received the full amount of work loss benefits owed to it.[13]

Appellants also contend that an additional issue concerns interest allegedly owed to the Gilbert estate. They argue as follows: As this court held in *Antanovich v. Allstate Insurance Company*, 320 Pa.Super. 322, 467 A.2d 345 (1983), *aff'd*, 507 Pa. 68, 488 A.2d 571 (1985), post-mortem work loss benefits, unlike those owed to a surviving victim, are to be paid in a lump sum. *Id.*, 320 Pa.Superior Ct. at 341, 467 A.2d at 355. Pursuant to § 1009.106(a)(2) of the Act, 40 P.S. § 1009.106(a)(2), benefits are overdue if not paid within thirty days of the obligator's receipt of reasonable proof of the fact and amount of loss, and overdue payments bear interest at a rate of eighteen percent per annum. Keystone was notified of Brian Gilbert's death shortly after it occurred but delayed five months in making the $10,000 payment. Accordingly, interest is owed to the estate as the result of Keystone's delay.

Assuming for the sake of argument that appellants are correct, the fact that the Gilbert estate was owed interest does not warrant Danny Gilbert's intervention as an additional representative plaintiff in the present action. In his

13. In light of our resolution of this issue, we do not consider Keystone's assertion that the statute of limitations is an additional bar to the estate's claim.

petition to intervene, Gilbert averred that his claim "is identical to the claims of other class members, in that it seeks maximum basic work loss benefits, plus full interest and attorney's fees...." We have determined, however, that the Gilbert estate has already received the full amount of post-mortem work loss benefits to which it is entitled. Therefore, Gilbert's claim is not identical to that of other class members and he cannot serve as a representative plaintiff in the class action.

Accordingly, appellant's Petition to Intervene is properly denied.

### D. Phil Sanchez

Phil Sanchez is the administrator of the estate of his mother, Barbara Sanchez, a pedestrian who was struck and killed by an automobile on May 20, 1984. Barbara Sanchez did not have automobile insurance. Keystone, the insurer of one of the vehicles involved in the accident, paid medical bills and funeral and survivor's loss benefits. Appellants assert that post-mortem work loss benefits are also owed. The trial court denied Sanchez's petition on the grounds that 1) it was barred by the doctrine of *lis pendens*, Sanchez as estate administrator having also filed an action for work loss benefits in the Court of Common Pleas of Philadelphia County, and 2) Barbara Sanchez was not an insured within the meaning of the class action complaint. Appellants challenge both grounds of the trial court's ruling.

In a post-argument letter, Keystone informed this Court that Sanchez and Keystone have settled the action brought by Sanchez in the Philadelphia County Court of Common Pleas, the settlement having been approved by the court on February 15, 1990. Sanchez's counsel in the present appeal (who did not represent Sanchez in the Philadelphia action) do not dispute the existence of such a settlement, but they contend that they are nevertheless owed attorney's fees pursuant to § 1009.107 of the No-fault Act, 40 P.S. § 1009.107. We find counsel's argument to be without

merit. Accordingly, as there is no longer an actual case or controversy for this Court to decide, Sanchez's appeal is moot. *Richards v. Trimbur,* 374 Pa.Super. at 359, 543 A.2d at 119.

E. Conclusion

Having examined the merits of the petitions to intervene, we agree with the trial court that none are sufficient to establish a right of intervention under Pa.R.C.P. 2327. Therefore, the denial of the petitions by the trial court does not operate as a practical denial of relief obtainable in no other way. Thus, the orders are not appealable as to the petitioners/appellants. *See Frey's Estate, supra.*

### IV.

Appeals taken by petitioners/appellants are quashed. Summary judgment is vacated and case remanded for proceedings consistent with this opinion.

ROWLEY, J., concurs in the result.