1999-NMSC-006

976 P.2d 1

ALLSUP'S CONVENIENCE STORES, INC., and Allsup's Enterprises, Inc., Plaintiffs–Appellants and Cross–Appellees,

v.

The NORTH RIVER INSURANCE COMPANY and The United States Fire Insurance Company, Defendants–Appellees and Cross–Appellants.

No. 22,621.

Supreme Court of New Mexico.

Dec. 3, 1998.

Rehearing Denied Jan. 29, 1999.

Ron Morgan, Chris Key, Michael Browde, Albuquerque, for Appellants and Cross–Appellees.

Civerolo, Wolf, Gralow & Hill, P.A., Ellen M. Kelly, Albuquerque, Fowler, Schimberg, & Cowman, P.C., Daniel M. Fowler, Denver, Skelton & Woody, Robert J. Woody, Scott K. Arnold, Austin, for Appellees and Cross–Appellants.

## OPINION

McKINNON, J.

{1} Today we consider the appeal of plaintiff-appellants Allsup's Convenience Stores and Allsup Enterprises and the cross-appeal of North River Insurance Company. This case raises an important question about the appealability of remittitur orders. We hold that such appeals should be allowed, and that a remittitur should not have been ordered; therefore, the trial court is reversed on that issue and the jury verdict reinstated. As to all other issues, we affirm.

## I. FACTS AND ISSUES

{2} The appellants in this case are Allsup Enterprises, Inc. and its subsidiary, Allsup's

Convenience Stores ("Allsup's").[1] The appellees are North River Insurance Company and United States Fire Insurance Company ("North River"), which were, respectively, the workers' compensation and general liability insurers from 1984 to 1990 for all of Allsup's businesses. Below, the appellees were formally denominated "Crum and Forster Commercial Insurance and its Affiliates North River and U.S. Fire." The insurance carrier defendants were referred to collectively as "Crum and Forster" throughout the proceedings in the lower court. North River and U.S. Fire jointly have been the real parties in interest throughout the relevant period, and as stated by North River in its brief on cross-appeal, references in the record to "Crum and Forster" include defendants North River and U.S. Fire.[2] Thus, wherever "Crum and Forster" is referred to here, it refers to the acts of North River.

{3} North River and Allsup's entered into a series of agreements for retrospective premium insurance. Under this plan, the premium is based in part upon the actual losses that occur during the policy period. Since these actual losses often or usually are not known until after the end of the policy period, the insured pays an estimated premium during the period, which is retrospectively adjusted downward or upward to a certain maximum at the end of the period. The adjustment depends on the insured's paid or incurred losses, according to the type of policy.

{4} On the policies that form the background in this case, Alexsis, Inc. was the third party administrator directly responsible for claims handling. A three-way Memorandum of Agreement was signed to govern the relationship among Allsup's, Crum & Forster, and Alexsis. Three areas of disagreement developed between North River and Allsup's, that later became claims in this lawsuit. The claims are: 1) North River's alleged breach of obligations with respect to the administration of workers' compensation claims made against Allsup's, specifically ob-ligations under the Memorandum of Agreement that Allsup's claims, and North River denies, imposed on North River a duty to supervise and ensure the quality of claims handling by Alexsis; 2) North River's alleged wrongful drawdown on a letter of credit, where the issue is which premiums under a number of successive policies were backed by the letter; and 3) North River's alleged failure to perform loss control services, such as instituting programs to diminish injuries on the job, deemed by Allsup's to be integral to the risk financing function of North River, but claimed by North River to be a role it never undertook.

{5} A number of other issues are before us on appeal: 1) whether Allsup's has foregone the opportunity to object to certain jury interrogatories and the special verdict form; 2) whether the trial court properly found the Memorandum of Agreement to be ambiguous as a matter of law and if so, whether the jury's interpretation thereof was supported by substantial evidence; 3) whether the covenant of good faith and fair dealing is enforceable against North River for a failure to disclose information regarding the claims handling by Alexsis; 4) whether North River owed a fiduciary duty to Allsup's and, if so, whether it was breached; 5) whether the jury was properly instructed under NMSA 1978, § 57–12–1 to –22 (1995); 6) whether the trial court's granting of summary judgment in favor of Allsup's on the drawdown on the letter of credit was correct; 7) whether the jury award of punitive damages was unconstitutional or otherwise excessive; 8) whether the remittitur of a punitive damages award is properly before this Court, and if it is, whether it should be sustained or the jury's verdict reinstated. We consider the last issue first because of its jurisdictional importance.

## II.  ALLSUP'S APPEAL

### A.  Remittitur

{6} On November 14, 1994, judgment was entered on the jury verdict of $540,000

---

1.  The claims against defendants Alexsis, Inc. and Alexander & Alexander were settled after trial.

2.  North River says in its brief: "North River and U.S. Fire were both members of a group of insurance companies that sometimes used the assumed name of Crum & Forster Commercial Insurance, or 'CFCI,' during the relevant period. . . . Thus references in the record and transcripts to 'Crum & Forster' would include defendants North River and U.S. Fire."

in compensatory damages for Allsup's and against North River for inadequate claims handling, and for $4,792 in compensatory damages for the wrongful drawdown of the letter of credit. The jury also assessed punitive damages against North River for $4,000,000 for bad faith in the supervision of handling of claims and $500,000 for the wrongful drawdown. By directed verdict, the trial court awarded North River $1,645,-708 on its counterclaim for unpaid premiums by Allsup's.

{7} On November 28, 1994, North River filed a "Motion to Amend the Judgment, for Judgment Notwithstanding the Verdict, or in the Alternative, for New Trial, or for Remittitur." On December 27, 1994, the trial court issued Memorandum Order No. 66, addressed to North River's motion. The motion for JNOV was denied. With respect to the issue of remittitur or a new trial, the motion was framed in alternative terms. We consider the order, on its face granting the motion for remittitur, to have been a grant of North River's motion generally, so that Allsup's had a choice when the motion was granted of accepting remittitur or a new trial. The court exercising its discretionary power, albeit ambiguously, offered Allsup's the option of remitting a part of the award or accepting a new trial. As stated in *Richardson v. Rutherford,* 109 N.M. 495, 503, 787 P.2d 414, 422 (1990), "it has long been the law in this state that the trial court may require a remittitur as an alternative to the grant of a new trial to the unsuccessful party." The trial court's order granted remittitur on the punitive damages award in the amount of $3,000,000 on the supervision of claims handling, and in the amount of $400,-000 on the drawdown on the letter of credit.

{8} The next day, on December 28, 1994, North River filed a motion under Rule 1-60(B) NMRA 1998 asking the court to "stipulate a time period during which Allsup's had to either accept a reduction or elect a new trial." Rather than respond to this motion or make an election, Allsup's filed its Notice of Appeal on December 29, 1994. The trial judge then ruled she lacked jurisdiction to consider the merits of North River's motion to clarify. *See Khalsa v. Levinson,* 1998-

NMCA–110, ¶ 12, 125 N.M. 680, 964 P.2d 844 (whether an order is a "final order" is a jurisdictional question); *Montoya v. Anaconda Mining Co.,* 97 N.M. 1, 4, 635 P.2d 1323, 1326 (Ct.App.1981) (same).

{9} Allsup's appeal initially appeared not to be accommodated by our case law and appellate rules. *Nally v. Texas–Arizona Motor Freight, Inc.,* 67 N.M. 153, 156, 353 P.2d 678, 680 (1960) (order granting, in the alternative, a remittitur or a new trial not appealable; plaintiff may preserve the issue, accept new trial and appeal thereafter). A plaintiff such as Allsup's is denied review of the district judge's ruling of law that the verdict was excessive, the procedure in place requiring a new trial instead of such review, rather than treating the parties equally and attributing finality to the judgment. Our constitution provides "that an aggrieved party shall have an absolute right to one appeal." N.M. const. art. VI, § 2. But here, the option of having a new trial is substituted for an absolute right to appeal on the issue of remittitur. Thus, we decide anew whether a claimed error in granting a motion for a new trial or for remittitur should be reviewed as any other claimed error would be on appeal.

■ {10} The historic rationale for remittitur practice is that it saves the time and expense of a new trial if the plaintiff will accept a lesser sum as a verdict. The plaintiff is satisfied because the expense of a new trial is avoided, and the defendant is satisfied because he or she either obtains a new trial, or has had the verdict against him or her reduced. Thus this procedure generally has the effect of facilitating settlement, thereby enhancing judicial economy. *See Hudson v. Otero,* 80 N.M. 668, 672, 459 P.2d 830, 834 (1969). It is said that finality and repose are achieved because the "risks of a verdict less than the amount to which the remittitur order has reduced the plaintiff's recovery are ... calculated to induce most reasonable plaintiffs to accept the remittitur and call it a day." *Donovan v. Penn Shipping Co., Inc.,* 536 F.2d 536, 538 (2d Cir.1976), *aff'd,* 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977), quoting *Evans v. Calmar S.S. Co.,* 534 F.2d 519 (2d Cir.1976).

{11} In the federal courts, this familiar remittitur procedure gained the United States Supreme Court's stamp of approval in *Donovan*, which barred plaintiffs from seeking review of remittitur orders, even those accepted "under protest," which is merely the procedural technique whereby remittitur is conditionally accepted for purposes of rendering the judgment final even though the plaintiff does not acquiesce in the aspect of damages. The Court offered no analysis for its ruling, but merely cited to "a long and unbroken line of decisions [that] has frequently been applied." *Wiggs v. Courshon*, 485 F.2d 1281, 1283 (5th Cir.1973). The Court in this way employed only an "estoppel" or "tradition" argument to meet a considerable body of critical commentary and case law on the subject. *See id.; Delta Engineering Corp. v. Scott*, 322 F.2d 11, 15 (5th Cir.1963). *See generally* Irene Deaville Sann, *Remittiturs (and Additurs) in the Federal Courts: An Evaluation with Suggested Alternatives*, 38 Case Western Reserve L.Rev. 157, 173 (1987–88).

{12} For example, in *Dimick v. Schiedt*, 293 U.S. 474, 486, 55 S.Ct. 296, 79 L.Ed. 603 (1935), the Supreme Court held that the procedure of additur was unconstitutional as a reexamination of jury verdicts in violation of the Seventh Amendment. Obviously facing the charge that remittitur was no better or worse, the Court said:

> In the light reflected by the foregoing review of English decisions and commentators, it, therefore, may be that if the question of remittitur were now before us for the first time, it would be decided otherwise. But the doctrine has been accepted as law for more than a hundred years and uniformly applied in the federal courts during that time.

293 U.S. at 484–85, 55 S.Ct. 296. The Supreme Court's view against an "under protest" procedure has been called "approbratory" in that the trial court is seen as somehow doing the plaintiff a favor to help it avoid a new trial, resulting in a judgment that is the equivalent of a verdict of a "reasonable" jury, which is unappealable traditionally. *See* Note, *Appealability of Judgments Entered Pursuant to Remittiturs in Federal Courts*, 1975 Duke L.J. 1150, 1158 (1975). Such a theory can hardly be said to apply to cases like the instant one where the plaintiff is outraged, not mollified, by the remittitur choice, and where there is disagreement among the plaintiff, defendant, and trial court as to what a "reasonable" jury should have awarded. Indeed, if remittitur practice forces most plaintiffs to accept, then the point is proven that the present system deprives the plaintiff of any real opportunity to challenge the use of remittitur. *See Donovan*, 536 F.2d at 539 (Feinberg, dissenting). At one end, the plaintiff is denied a jury verdict, and at the other end is prevented from appealing that denial, being placed at the mercy of the trial judge. It has also been noted,

> A careful analysis of the plaintiff's position ... does not necessarily lead to the conclusion that the remitting plaintiff reaps such great benefits. By consent to a remittitur, the plaintiff cannot "freeze" his verdict at the reduced amount. He can lose part or all of it on defendant's appeal and can even be subjected to the uncertainties of a new trial if the appellate court reverses the trial court on the denial of defendant's new trial motion.

Irene Sann, *Remittitur Practice in the Federal Courts*, 76 Columbia L.Rev. 299, 314 (1976).

{13} There is also serious debate on whether the current remittitur procedure actually saves time and money. When a nonremitting plaintiff elects a new trial, a jury must be impaneled and valuable judicial time is consumed, and in this case it may be noted, a potential twelve weeks—the length of the first trial. Even assuming judicial economy to be a relevant factor, it is not or at least should not be the overriding goal of our system in resolving disputes:

> [I]n civil matters like this one, courts exist to resolve disputes between litigants. When a plaintiff claims that he has been injured because of the fault of the defendant, the court proceeding is designed to give the plaintiff a fair opportunity to prove his contentions and to obtain adequate compensation, if he is correct. Conversely, a defendant is afforded a fair

chance to meet a plaintiff's contentions head-on. *The interest of courts in efficient administration, though important, is not superior to the interests of the plaintiff or the defendant.* *Donovan,* 536 F.2d at 538 (Feinberg, dissenting) (emphasis added); *see also* Barbara Lerner, *Remittitur Review: Constitutionality and Efficiency in Liquidated and Unliquidated Damage Cases,* 43 U.Chicago L.Rev. 376, 391 (1976) (Lerner Note) ("The main rationale for remittitur is the promotion of efficiency. Yet those who support the practice on this basis clearly do not wish to compromise justice in the interest of efficiency.")

{14} We believe that for the court to require a remittitur when there is such a limited right of appeal is a violation of the plaintiff's constitutional right to a trial by jury, since, as a practical matter, the verdict is that of the court and not the jury. N.M. Const. art. II § 12. That is why under current practice it has been held that the court must offer the plaintiff the alternative of undergoing a new trial. *Chavez–Rey v. Miller,* 99 N.M. 377, 379, 658 P.2d 452, 454 (Ct.App.1982). But as we have seen, there is an apparent conflict under current practice between art. II, § 12 and art. VI, § 2 of our constitution. While the new trial option seems to serve the purposes of art. II, § 12, it frustrates the purposes of art. VI, § 2, providing for appeals. Since a plaintiff's right to trial by jury may be protected with the option of a new trial, that very mechanism prevents meaningful and efficient review of the grant of remittitur. The rule we announce today, that a plaintiff must choose between a remittitur and a new trial, and that remittitur may then be accepted "under protest" and appealed, resolves this conflict in that the appeal of a judge's remittitur order assures the voices of the jury will ultimately be heard in accordance with art. II, § 12, and that the right to appeal the legal decision of the trial judge will be unfettered as mandated by art VI, § 2. We also believe this change will improve the consistency of verdict results along the lines of like cases being treated alike, and that it will alleviate claims of alleged arbitrary conduct by trial courts. *See* Lerner Note at 391. In addition, although we would lack jurisdiction over an immediate interlocutory appeal if Allsup's had chosen to accept a new trial, *see* Rule 12–201(D) NMRA 1998, it is clear that an accepted order for remittitur is appealable under the statute providing for appeals, NMSA 1978, § 39–3–2, since it is a "final order after entry of judgment which affects substantial rights." *Cf. Sunwest Bank v. Nelson,* 1998–NMSC–012, ¶ 9, 125 N.M. 170, 958 P.2d 740 (stating that an order of dismissal for improper venue "decisively affected Sunwest's right, as plaintiff, to choose a venue pursuant to [statute] and that an immediate appeal was necessary to vindicate this right").

{15} At least nine other states have adopted a rule similar to the one we adopt today, all with apparent success. *See Betz v. Timken Mercy Med. Ctr.,* 96 Ohio App.3d 211, 644 N.E.2d 1058, 1060 (1994); *Hazelwood v. Harrah's,* 109 Nev. 1005, 862 P.2d 1189, 1192 (1993); *Hill v. GTE Directories Sales Corp.,* 71 Wash.App. 132, 856 P.2d 746, 748 (1993); *Rety v. Green,* 546 So.2d 410, 413 (Fla.App. 3 Dist.1989); *Robinson v. Old Dominion Freight Line, Inc.,* 236 Va. 125, 372 S.E.2d 142, 142 (1988); *Harmon v. Motors Ins. Corp.,* 493 So.2d 1370, 1371 (Ala.1986); *Stilwell v. Williams,* 476 So.2d 24, 25 (Miss. 1985); *Stewart v. Genesco, Inc.,* 406 A.2d 25, 26 (Del.Supr.1979); *Ellis v. White Freightliner Corp.,* 603 S.W.2d 125, 129 (Tenn.1980).

{16} The next questions which must be considered are when and how a trial judge may justifiably find the jury's award of damages to be excessive, and what is the standard of review. The proper amount of damages is of course bound up in the assessments made by a jury during the actual trial itself, for its verdict is presumed to be correct. It is a "fundamental function of a jury to determine damages." *Richardson v. Carnegie Library Restaurant, Inc.,* 107 N.M. 688, 690, 763 P.2d 1153, 1155 (1988) (overruled on other grounds by *Trujillo v. City of Albuquerque,* 1998–NMSC–031, 125 N.M. 721, 965 P.2d 305). The trial judge, on the other hand, is empowered to, with discretion, provide stability and order during the proceedings. But the judge is a very potent figure, who must not use the

position to exert power or influence over the jury. *State v. Olivares*, 95 N.M. 222, 222, 620 P.2d 380, 380 (Ct.App.1980). The Court of Appeals has said recently that,

> time and time again our appellate courts have come to the conclusion that the best way to arrive at a reasonable award of damages is for the trial judge and the jury to work together, each diligently performing its respective duty to arrive at a decision that is as fair as humanly possible under the facts and circumstances of a given case.

*Sandoval v. Chrysler Corp.*, 1998–NMCA–085, ¶ 16, 125 N.M. 292, 296, 960 P.2d 834, 838. In the case of a proposed remittitur, we have said numerous times:

> [T]he findings of the jury should not be disturbed as excessive except in extreme cases, as where it results from passion, prejudice, partiality, sympathy, undue influence, or some corrupt cause or motive where palpable error is committed by the jury, or where the jury has mistaken the measure of damages. However, the mere fact that a jury's award is possibly larger than the court would have given is not sufficient to disturb a verdict.

*Richardson v. Rutherford*, 109 N.M. 495, 503, 787 P.2d 414, 422 (1990), quoting *Montgomery v. Vigil*, 65 N.M. 107, 113, 332 P.2d 1023, 1027 (1958) and *Hall v. Stiles*, 57 N.M. 281, 285, 258 P.2d 386, 389 (1953). In *Montgomery*, we said in addition:

> Our former practice of ordering reductions of awards where we thought them to be excessive without *specifically finding* an indication of passion, prejudice, etc., as was done in [*Mares v. N .M. Public Service Co.*, 42 N.M. 473, 82 P.2d 257 (1938) and *Boydston v. Twaddell*, 57 N.M. 22, 253 P.2d 312 (1953) ] was changed in the case of *Hall v. Stiles*, without mention of the former cases. In view of possible conflicts, we expressly overrule such practice as was followed in the *Mares* and *Boydston* cases in favor of the rules later announced in *Hall v. Stiles*. (Emphasis added.)

{17} In light of the above, it is clear that only when the opinion of the trial judge is demonstrably more reliable than that of the jury will its opinion be recognized. The burden of knowing when to order remittitur falls particularly heavily upon the trial judge, whose relation to the jury and the actual trying of the case must in turn be capable of assessment by a reviewing court. It is for this reason that we now extend the "specific finding" requirement of *Montgomery* to mean that the trial judge must, when a remittitur is ordered, provide a clear articulation of how and why damages are excessive, applying the above quoted standard in *Richardson v. Rutherford* to the particular case.

{18} To summarize, we hold that when ordering a remittitur, a trial court must offer the plaintiff the option of a new trial, and that the plaintiff must choose between the two and may accept the remittitur under protest and appeal. On appeal, the record of the court's specific findings is reviewed on a passion or prejudice standard as detailed in *Richardson v. Rutherford.* To the extent this holding is inconsistent with *Hudson, Nally,* and other precedent, such cases are hereby expressly overruled.

{19} The trial judge, therefore, has *limited* superintendence when ordering a remittitur in that the exercise of such discretion must be supported by express reasons, *see Rety v. Green,* supra, 546 So.2d at 418, and those reasons must establish the presence of "passion, prejudice, partiality, sympathy, undue influence or some corrupt cause or motive." *See Richardson v. Rutherford,* 109 N.M. at 503, 787 P.2d at 422. A problem is presented, however, in just how these factors may be established on appeal, since the trial court's reasons directly conflict with the jury verdict and the defendant must carry the burden of justifying nullification, in substantial part, of that verdict. Analogous case law provides a mechanism that we believe solves the problem. It is the general rule that the burden of proof on appeal shifts to the appellee upon the trial court's issuance of findings that grant a new trial, when the findings are subject to appeal. *See* 58 Am-Jur2d, New Trial, § 562 (1998 Supp.); 5 C.J.S., Appeal and Error, § 768 (1998 Supp.) In Nebraska, it is held that where a district court grants a new trial, stating insufficient reasons, an appellant meets its burden of attacking that ruling "by submitting the rec-

ord to the Supreme Court with the contention that there was no prejudicial error; the burden then shifts to the appellee to identify any prejudicial error in the record which justified the granting of a new trial." *Lemke v. Northwestern Public Service Co.*, 233 Neb. 223, 444 N.W.2d 326, 328 (1989). In the present scenario, the appellant attacks the reasons for remittitur given by the trial judge by demonstrating that the record supports the contention that there was no error in the verdict. The burden then shifts to the appellee to show there was evidence to support the judge's reasoning. Similarly, in Arizona, when a trial court sets forth grounds for a new trial that the appellant asserts fail the specificity requirements of the appropriate rule, the burden shifts to the appellee to show that the trial court was correct. *Liberatore v. Thompson*, 157 Ariz. 612, 760 P.2d 612, 617 (1988). Missouri requires the trial court to specify adequate grounds on which a new trial is granted, and the court's "failure to do so creates a presumption of error and shifts the burden of proving reversible error from the appellant to the respondent in whose favor the new trial was granted." *Hall v. Missouri Highway and Transp. Comm'n*, 861 S.W.2d 720, 721 (Mo.App.E.D. 1993). Essentially the same result should occur here, where the trial court sets forth certain reasons for which the appellant asserts there is a lack of support in the record, the burden then shifts to the appellee to show that the trial court was correct.

■ {20} We believe that this procedure will provide an efficient means by which the order granting a remittitur or, in the alternative, a new trial may be dealt with on appeal. In the instant case, the trial judge did provide her reasons for ordering remittitur. She wrote in her letter opinion, "The jury's award of $500,000 in punitive damages on the [letter of credit] claim is utterly disproportionate to the actual damages awarded on that claim and, more importantly, to the evidence concerning North River's culpability on this issue." We see in this statement no hint that passion, prejudice, partiality, sympathy, undue influence or some corrupt cause or motive entered into the jury's deliberations. Similarly, as to claims administration, the court said, "The $4,000,000 punitive dam-

ages award ... is clearly excessive, given the entirety of the evidence concerning plaintiff's and North River's conduct." Even assuming that the expression "clearly excessive" constitutes a viable finding implying passion or prejudice, *see Henderson v. Dreyfus*, 26 N.M. 541, 557, 191 P. 442, 449 (1919), we disagree that here the award was per se excessive, and more importantly, neither the trial court nor North River has called our attention to substantial evidence which would support a determination that the jury awards were motivated by any of the *Richardson* factors. While we could affirm a trial ruling which is right for the wrong reason, *Jaramillo v. Jaramillo*, 113 N.M. 57, 62, 823 P.2d 299, 304 (1991), we may not do so in the absence of any substantial evidence supporting what would be the right reason. Furthermore, our review of the findings as to punitive damages, apart from the question of remittitur, shows them to be in fact supported by substantial evidence. *See Green Tree Acceptance, Inc. v. Layton*, 108 N.M. 171, 174, 769 P.2d 84, 87 (1989) and Section II.D. hereof.

## B. Issues Concerning Jury Instructions

■ {21} Allsup's also raises two issues concerning the jury instructions. The first is that the trial court abused its discretion in reducing by $3,000,000 damages for the alleged failure of North River to advise on the need for and availability of loss control services such as preventive programs to reduce future claims. Presumably these services would ultimately have resulted in the reduction of premiums to Allsup's. The jury found that North River owed a fiduciary obligation to disclose this information and breached it in violation of the Unfair Trade Practices Act, NMSA 1978, Sections 57–12–1 to –22. Relying on NMSA 1978, Section 37–1–4, the trial court ruled, however, that a four-year statute of limitations applied to the loss control claim, and that North River was not on sufficient notice thereof until over four years from accrual of the claim, when Allsup's second amended complaint was filed explicitly alleging elements of the claim.

{22} We do not reach the merits of this issue because Allsup's must confront here the same problem it faced in post-trial motions,

where it argued that loss control damages should be used as a set-off to North River's judgment against it for unpaid premiums. The difficulty is that the jury interrogatories were framed to first determine when the claim accrued, i.e., whether it was barred by the statute of limitations. If the answer to that question was in the affirmative (which it was), then North River could not be responsible for loss control damages. Allsup's never objected to the form or substance of the interrogatories thereby preserving the issue for appeal. Rule 12–216, NMRA 1998 provides: "To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked ..." We have held that "the trial court must be alerted to a claimed non-jurisdictional error to preserve it for consideration on appeal." *Marquez v. Marquez,* 74 N.M. 795, 799, 399 P.2d 282, 285 (1965). As the trial judge stated in her letter opinion on post-verdict motions, "[t]his error, which was not brought to the Court's attention in time to correct the interrogatories, should not be the basis for a new trial ." Similarly, since the claimed error was not preserved, there is no basis for relief on appeal. We note here that because there are no damages awarded on the loss control issue, we need not deal with North River's claim that damages awarded on loss control and on claims handling were duplicative.

{23} The second issue relating to jury instructions concerns whether joint and several liability must apply to certain claims regardless of how they were presented to the jury. The Several Liability Act, NMSA 1978, § 41–3A–1 to –2 (1987) abolished joint and several liability in all claims to which the doctrine of comparative fault applies. Traditionally, this category of claims does not include contract cases (the basis for Allsup's' claims handling claims) because " 'contract law is, in its essential design, a law of strict liability, and the accompanying system of remedies operates without regard to fault.' " *Paiz v. State Farm Fire and Cas. Co.,* 118 N.M. 203, 212, 880 P.2d 300, 309 (1994), quoting 3 E. Allan Farnsworth, *Farnsworth on Contracts* § 12.8 at 190 (1990). Thus, the doctrine does not apply in a contract case. *See Key v. Chrysler Motors Corp.,* 119 N.M. 267, 275, 889 P.2d 875, 883 (Ct.App.1995).

{24} Again, we find it unnecessary to reach the substance of the issue. The special verdict form in this case reads in relevant part:

> Question 3: Compare the fault of the parties ... for the excessive premium caused by inadequate claims administration or supervision. The Court will multiply each party's percentage times the total claims administration or supervision damages as found in Question 2. The Court will then enter judgment against any party you have found liable in proportion to the damages found as to that party.

Thus, the form asked for an apportionment of damages caused on all liability theories by all parties, the result being that North River was found only 30% liable, or to the extent of $540,000. At the time the form was prepared, Allsup's now contends, it was properly sitting on its right to have the trial judge rule post-verdict for joint and several liability, and after the jury verdict, Allsup's so moved the court. The trial judge found that there had been considerable efforts by herself and counsel to agree on the form for the special verdict and that Allsup's was quiet if not in declination when presented with the option of objecting to comparative fault questions, even though contract issues were involved. *See Sievert v. LaMarca,* 367 N.W.2d 580, 583 (Minn.App.1985) (where special verdict submitted both contract and negligence theories in comparative fault form, and no party objected, instruction of trial court became law of the case).

{25} Allsup's now contends that it intended the comparative fault wording to refer to negligence claims only, but a reading of Question 3 indicates it covered all claims handling claims and all defendants. Allsup's further agreed to a deviation from the standard format of UJI 13–2220, NMRA 1998 which compares "negligence" to a form comparing "fault." The verdict was clearly and irrevocably structured before it was rendered so as to make it now impossible to determine which claims were successful against which defendants and what the extent of damages was. Allsup's was apparently aware of this potential outcome, but chose to wait and

advance an all-or-nothing position after the verdict, in other words, move for joint and several liability rather than to ask that a more detailed verdict form be put before the jury. The opportunity for Allsup's to complain with regard to this instruction is therefore, foregone.

## III. NORTH RIVER'S CROSS–APPEAL

### A. Contract Ambiguity

{26} The first argument in the cross-appeal of North River is that breach of contract damages were improperly awarded because the contract among Allsup's, North River, and Alexsis did not provide for North River to supervise or ensure claims handling. This is because the contract is alleged to have been unambiguous and, therefore, not subject to fact finding by the jury as to whether these duties were agreed to be included. North River therefore asks us to reverse the award of compensatory and punitive damages that were based on the jury's finding that the contract did provide for supervision of claims handling and the finding that North River breached the agreement in that regard.

■ {27} A contract is deemed ambiguous only if it is reasonably and fairly susceptible of different constructions. *Levenson v. Mobley*, 106 N.M. 399, 401, 744 P.2d 174, 176 (1987). "[I]n determining whether a term or expression [in the contract] is unclear, a court may consider evidence of the circumstances surrounding the making of the contract, and of any relevant usage of trade, course of dealing, and course of performance." *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 508–09, 817 P.2d 238, 242–43 (1991). Further, the language of the entire agreement should be construed together. *See Atlas Assurance Co. v. General Builders, Inc.*, 93 N.M. 398, 400, 600 P.2d 850, 852 (Ct.App.1979) (holding that terms of a contract should be construed as a whole). Thus "a single sentence or paragraph may not be selected as the entire dependence for the determination that a contract is clear and plain as to its meaning, or that it is uncertain, indefinite, and ambiguous." *Id.* citing *Hoge v. Farmers Market & Supply Co.*, 61 N.M. 138, 141, 296 P.2d 476, 478 (1956). When the contextual evidence is reasonably and fairly susceptible of conflicting interpretations, the jury determines the meaning to be ascribed to particular terms as a question of fact before deciding issues of breach and damages. *C.R. Anthony*, 112 N.M. at 509, 817 P.2d at 244.

■ {28} A trial judge's determination that a contract is ambiguous is one of law that this Court reviews de novo. *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 782, 845 P.2d 1232, 1236 (1993). If the judge has correctly found that there is an ambiguity, we then review the jury's findings of fact to determine whether those findings are supported by substantial evidence. *Haaland v. Baltzley*, 110 N.M. 585, 588, 798 P.2d 186, 189 (1990). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* "On appeal all disputed facts are resolved in favor of the successful party with all reasonable inferences indulged in support of the verdict and all evidence and inferences to the contrary disregarded." *Id.* at 589, 798 P.2d at 190.

■ {29} The Memorandum of Agreement in the instant case is reproduced here in relevant part:

> Alexsis, Inc. agrees to provide complete administration, investigative and adjustment services to Allsup Enterprise (sic), *on behalf* of Crum and Forster . . . [3]

> Crum and Forster Commercial Insurance Co. agrees to pay the cost of all experts, outside investigation expenses and professional assistance required to investigate and adjust claims.

> All lawsuits received on claims under this agreement shall be handled as follows: . . . Alexsis will give immediate notice of the suit to Crum & Forster . . . Alexsis shall manage all litigation on claims under this agreement in accordance with Crum & Forster Commercial Insurance's litigation management practices and procedures.

---

**3.** *See* note 2 for the relationship between Crum and Forster and North River.

Alexsis, Inc. will provide liaison between Crum and Forster Commercial Insurance Co. and Allsup Enterprise (sic), Inc.... Alexsis is granted $15,000 settlement, draft signing and draft issuing authority per claim ... Crum & Forster Commercial Insurance *may conduct* periodic audits of Alexsis' claims files and operations to *insure compliance* of all procedures.

(Emphasis added.) There are several sources of ambiguity in the Memorandum. First, the language "on behalf of" is uncertain as to whether it creates an agency or, if not, what relationship among the parties was established. It does not clarify the problem of oversight of Alexsis' operations, but merely states that Alexsis will represent Crum and Forster's interest in some way. Whether and how Crum and Forster was to oversee Alexsis is not rendered clear by the manner in which lawsuits were to be handled, which indicates that in the event of a serious problem, Crum and Forster would step in and take control. The words "will provide liaison" are legally unclear, and it is ambiguous to what end and for the benefit of which party Crum and Forster was to conduct audits or insure compliance with various procedures.

{30} The evidence as to course of dealing between Crum and Forster/North River and Allsup's, if anything, seems to create further ambiguity. They had a three-year relationship under a retrospective premium plan prior to entering into the Memorandum of Agreement, and during that time North River conducted audits of Alexsis' predecessor, the results of which were never requested by or presented to Allsup's. Allsup's had complained about Alexsis' claims administration, but complained only to Alexsis or Alexander & Alexander and not to North River. There was also evidence that Alexsis was heavily supervised by Crum and Forster as to all claims matters and in fact, Crum and Forster was familiar with and extremely concerned about the situation, as shown by contemporaneous internal memoranda.

{31} In sum, we conclude that the trial court correctly determined that the agreement was ambiguous as to whether North River had assumed a duty to Allsup's to supervise and ensure the adequacy of claims administration provided by Alexsis. This must be our conclusion in light of the optional and non-directive tone of many of the terms in the contract. Rather than stating forthrightly what the parties' obligations were, the contract left their status with regard to various duties unclear. Furthermore, a reading of all relevant provisions in the document, and the reaction of Crum and Forster personnel to the claims handling situation, lead us to the conclusion that the jury's interpretation of the ambiguity was supported by substantial evidence. There was a great deal of evidence presented on the parties' intentions, the purposes sought, trade custom, course of dealing, and course of performance, from which the jury could have found as it did on the issue. In particular, the control retained by Crum and Forster over the operations of Alexsis strongly indicates that Crum and Forster undertook, vis-a-vis Allsup's, to ensure the performance of Alexsis.

**B. Other Issues Surrounding Claims Handling**

{32} North River next attacks the jury findings on inadequate claims handling on three fronts: 1) the duty of good faith and fair dealing, 2) fiduciary duty, and 3) violation of the Unfair Practices Act.

{33} "Every contract in New Mexico imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract." *Paiz*, 118 N.M. at 212, 880 P.2d at 309. North River argues that it had no duty of good faith and fair dealing toward Allsup's in the claims handling supervision context because there was no contract for that service. Since we have held that North River had a duty under the Memorandum of Agreement to supervise and ensure Alexsis' claims handling, there was such a contract. Thus, the covenant of good faith and fair dealing applies.

{34} North River's next contention is that since both parties' interpretation of an ambiguous contract must be reasonable and since it behaved according to its presumptively reasonable interpretation of the

contract, it was acting in good faith with respect to the contract and cannot be held responsible for breaching the duty of good faith and fair dealing. While a contract that is ambiguous is said to be "susceptible to reasonable but conflicting meanings," *C.R. Anthony*, 112 N.M. at 509, 817 P.2d at 243, that does not mean that North River's interpretation was reasonable. The trial judge's assent that the contract was ambiguous was not an interpretation of the ambiguous provisions. The reasonableness or unreasonableness of a party's interpretation of a contract is never established until the jury resolves the ambiguity by deciding what the parties reasonably intended. This too is the standard for good faith. The breaching party is held to objective knowledge of the meaning of the contract from its inception, and held to the requirement of proceeding in good faith thereunder. *See generally*, 2 Farnsworth §§ 7.8–7.9.

{35} North River also attacks the jury's finding that it breached the covenant of good faith and fair dealing by failing to disclose to Allsup's the continuing inadequate claims handling by Alexsis. North River argues there is no case law specifically imposing such a duty and points to the fact that the Memorandum of Agreement provided that Alexsis was to act as a "liaison" between North River and Allsup's in these matters. The issue is whether and when an insurer has a good faith duty to disclose information to its insured. North River cites *Continental Potash, Inc. v. Freeport–McMoran, Inc.*, 115 N.M. 690, 701, 858 P.2d 66, 77 (1993), for the proposition that the implied covenant of good faith never requires a party to disclose material information. That case involved disclosure whereby a mineral operator would have had to subordinate its legitimate interest in the enterprise to that of royalty holders. Such a case, where a party would have to "bend over backwards" in the course of disclosing information, is not covered by the implied covenant of good faith and fair dealing. This does not mean that a party to the covenant is freed from making all types of disclosure in all cases. "The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement." *Bourgeous v. Horizon Healthcare Corp. .,* 117 N.M. 434, 438, 872 P.2d 852, 856 (1994). We see no reason in law or logic why this duty should always be a negative one; if good faith and fair dealing require it, there can be an affirmative duty to act in order to prevent the denial of the other party's rights under the agreement. Such an aspect of the covenant of good faith and fair dealing is commonly found in insurance cases. *See Weber v. State Farm Mut. Auto. Ins. Co.*, 873 F.Supp. 201, 208 (S.D.Iowa 1994) (duty to disclose coverage); *Sears Mortgage Corp. v. Rose*, 134 N.J. 326, 634 A.2d 74, 86 (1993) (obligation to disclose unprotected risks); *Mark Patterson v. Bowie*, 237 A.D.2d 184, 654 N.Y.S.2d 769, 771 (1997) (claim premised on duty to disclose information that might cause a prospective insured to forego insurance by keeping clear of the risk properly dismissed as repetitive of cause of action for breach of covenant); *Miller v. Keystone Ins. Co.*, 402 Pa.Super. 213, 586 A.2d 936, 941 (1991) (duty to inform of potential for adversarial relationship if insurer knows insured is relying on its advice and counsel), reversed on other grounds by 535 Pa. 531, 636 A.2d 1109 (1994)).

{36} In this case, the jury had concluded there was a contract between the parties and that North River had acted in bad faith generally with respect to the supervision of Alexsis' claims handling. We will not bar as legally ineffective their further conclusion—that mere good faith required disclosure by the insurer of continuing inadequate claims handling—when there is substantial evidence that such disclosure would have prevented the losses suffered by Allsup's in having to pay excessive premiums under a retrospective worker's compensation insurance plan. The right of Allsup's to receive a benefit of the agreement—a premium amount tied fairly to competent claims handling—was injured by North River, whose duty to disclose was called for by the circumstances. By not disclosing this information, North River benefitted because it received premium payments far greater than would otherwise have been due.

{37} We also affirm the determination that North River owed but breached a fiduciary obligation to Allsup's. "A fiduciary relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of one reposing the confidence." *State ex rel. Udall v. Colonial Penn,* 112 N.M. 123, 131, 812 P.2d 777, 785 (1991). The fiduciary duty is present "because of the fiduciary obligations inhering in insurance relationships and because of concerns arising from the bargaining position typically occupied by the insured and the insurer." *Romero v. Mervyn's,* 109 N.M. 249, 255, 784 P.2d 992, 998 (1989); *see also Chavez v. Chenoweth,* 89 N.M. 423, 430, 553 P.2d 703, 710 (Ct.App.1976) (interpreted in *Romero* to hold that relationship between insurer and insured imposes fiduciary obligation on insurer to deal with insured in good faith in matters pertaining to the performance of the insurance contract). In the instant case, despite the seeming sophistication of the insured, a situation clearly existed, because of the fact that under the retrospective premium plan the insurer could largely determine the amount of premiums, whereby a certain trust was reposed in the insurer, a trust which the evidence showed was violated.

{38} North River next argues that there was no basis for a finding that it violated the Unfair Practices Act because, it is contended, 1) the jury in fact made no such finding, 2) Allsup's never pled any claims under the Act, and 3) there is no contract underlying the claim.

{39} Questions 4 and 5 of the special verdict form dealt with the Act essentially by name and asked for an amount believed to be the damages caused thereunder and for an apportionment between North River and Alexsis. The questions were not filled in with a "zero," as they could have been, but were left blank, apparently because of an error on the special interrogatories form. That form sought specific answers regarding the conduct of the parties and was supposed to refer the jury to an appropriate place on the special verdict form where the ultimate verdict is stated, based on the facts stated in the interrogatories. In this case, the reference was erroneous, so that part of the special verdict form was never filled out.

{40} Where there appears to be a conflict between the special verdict and the special interrogatories, we attempt to reconcile the apparent differences in order to avoid a new trial. If there is a way to construe the jury's findings as reasonable, we will do so. *Atlantic and Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962). However, if inconsistencies show jury confusion, then a new trial may be warranted. *Global Van Lines, Inc. v. Nebeker,* 541 F.2d 865, 868 (10th Cir.1976). In this case, we know from the special interrogatories form that North River's failure to ensure that adequate claims handling was provided caused a "gross disparity between the value received by Allsup's and the price paid for Allsup's' worker's compensation program." This language tracks virtually word for word the language of the Act which reads:

> "unconscionable trade practice" means any act or practice in connection with the sale, lease, rental or loan, or in connection with the offering for sale, lease, rental or loan, of any goods or services ... which to a person's detriment ... (2) results in a *gross disparity between the value received and the price paid* .

NMSA 1978, § 57–12–2(E)(2) (emphasis added.) There is, therefore, a finding of a violation of the Act. The only problem is a technical one and no inconsistency or confusion on the part of the jury is indicated. Furthermore, no objection was ever made to the interrogatories.

{41} The claim that Allsup's never pled a violation of the Act is contrary to the record. In Allsup's' first amended complaint, the defendants, including North River, were charged in the Sixth Claim with having violated the Act. North River then claims there was no contract supporting the claim under the Act. While we do not hold that a contract is necessary to bring such a claim, we need not deal with this issue because we have found there was in fact a contract.

## C. Letter of Credit

{42} The next issue raised in North River's cross-appeal is whether the trial judge erred in granting Allsup's' motion for summary judgment on the issue of North River/Crum and Forster's drawdown on a letter of credit. Effective March 31, 1986, Allsup's, North River, and Crum and Forster entered into an agreement called "Paid Loss Retrospective Retention Premium Payment Agreement." It was required that Allsup's provide security for potential unpaid premiums, which they did in the form of Irrevocable Letter of Credit No. 1427, dated August 8, 1986. The Letter of Credit was amended twice to refer back to the years 1985 and 1984. All amendments referred to *paid loss* premium agreements. On April 30, 1987, Letter of Credit No. 1427 was replaced with letter of credit No. 1478. This occurred fairly contemporaneously with the parties changing from a *Paid Loss* Retrospective Retention Premium Payment Agreement to an *Incurred Loss* Retrospective Retention Premium Payment Agreement. Letter No. 1478 did not refer to any particular contract and was in effect until April 1, 1990. It was drawn down on for premiums due under the later *incurred loss* policy. Allsup's claims that it was the understanding of the parties that No. 1478, merely replaced No. 1427 and referred to the same paid loss policies. North River claims the different language in letter No. 1478 means it was intended to cover all premiums owed by Allsup's, and that its drawdown for premiums due under the incurred loss policy was, therefore, rightful.

{43} "In reviewing a grant or denial of summary judgment, this Court considers the undisputed facts, and determines whether under those facts summary judgment was proper as a matter of law." *Rummel v. Lexington Ins. Co.*, 1997–NMSC–041, ¶ 9, 123 N.M. 752, 945 P.2d 970. "Where there is any question as to any issue of material fact, summary judgment is inappropriate." *Id.* It is undisputed that on March 23, 1990, an attorney for Crum and Forster wrote on the matter, "[t]he workers' compensation policies issued by North River to Allsup's included a *Paid Loss* Retrospective Retention Premium Payment Agreement ... which required an irrevocable Letter of Credit ... Letter of Credit No. 1478 was issued ..." (Emphasis added.) The clear indication is that letter of credit No. 1478 was issued to cover unpaid premiums under a paid loss agreement. North River does not even argue that it drew down on the letter to cover such unpaid premiums. Given such an unambiguous statement of the understanding of North River concerning the letter of credit, and the absence of any facts to cause a dispute, we hold that summary judgment was properly granted. The same facts also justify, as within its sound discretion, the jury's finding of bad faith and of an award of punitive damages as discussed below.

## D. Punitive Damages

{44} North River first advances two due process arguments for why the punitive damages assessed by the jury were excessive, and then argues that in awarding punitive damages, the jury abused its discretion. North River's first constitutional argument is that insurance companies in general and North River in particular were singled out by the jury instructions as having to act only unreasonably, as opposed to acting in bad faith, in order to be held liable for punitive damages, and that its due process right was thereby violated. It argues there is no rational basis for this distinction, and that the disparate treatment aimed at insurance companies violates U.S. Const. amend. XIV and N.M. Const. art. 2, § 18 because such treatment creates a classification that is "so grossly over inclusive as to defy notions of fairness and reasonableness[,]" citing *McGeehan v. Bunch*, 88 N.M. 308, 313, 540 P.2d 238, 243 (1975). North River draws a line between bad faith conduct, which it agrees would support punitive damages, and merely unreasonable conduct, which it says would not support such damages. North River also argues that jury instruction No. 37 in the case confuses the two concepts so as to create a situation where an insurance company that acts in any way other than perfectly reasonably will improperly be liable for punitive damages. Jury instruction No. 37 reads as follows:

Under the "bad faith" claim, what is customarily done by those engaged in the insurance industry is evidence of whether the insurance company acted in good faith. However, the good faith of the insurance company is determined by the reasonableness of its conduct, whether such conduct is customary in the industry or not. Industry customs or standards are evidence of good or bad faith, but they are not conclusive.

{45} North River interprets this instruction (essentially UJI 13–1705, NMRA 1998) as meaning that the slightest unreasonableness makes an insurance company liable for punitive damages, which, it is argued, conflicts with *McGinnis v. Honeywell*, 110 N.M. 1, 9, 791 P.2d 452, 460 (1990), and other cases, where we held that a "culpable mental state" is a prerequisite to such liability. North River's interpretation of the way the jury instruction is likely to be received is creative, but not persuasive. We think the jury was more likely to comprehend the instruction as meaning that the good faith of the insurance company is determined by how reasonable the conduct of the insurance company is. In turn, the bad faith of the insurance company may be measured by how unreasonable its conduct is. While bad faith and unreasonableness are not always the same thing, there is a certain point, determined by the jury, where unreasonableness becomes bad faith and punitive damages may be awarded.

{46} In addition, we have held that if a jury receives an instruction that is subject to more than one interpretation, the ambiguity may be clarified by another part of the instructions. *State v. Sosa*, 1997–NMSC–032, par. 25, 123 N.M. 564, 943 P.2d 1017. Here, there was another instruction, No. 5, which reads:

To establish the claim of breach of the implied covenant of good faith and fair dealing by defendants North River, U.S. Fire, Alexander and Alexander and Alexsis, Allsup's has the burden of proving that one or more of the defendants acted in bad faith by not giving equal consideration to the interest of Allsup's as to its own interest in at least one of the following ways . . .

Related to its claims for punitive damages, *Allsup's contends and has the burden of proving that any bad faith actions on the part of North River were malicious, reckless or wanton, and, therefore punitive damages should be awarded.*

(Emphasis added.) If instruction No. 37 was unclear in any way, no ambiguity would survive a reading of No. 5, which comports with our holding in *Paiz*, 118 N.M. at 211, 880 P.2d at 308, that

[a] mental state sufficient to support an award of punitive damages will exist when the defendant acts with "reckless disregard" for the rights of the plaintiff—i.e., when the defendant *knows* of potential harm to the interests of the plaintiff but nonetheless "utterly fail[s] to exercise care" to avoid harm.

(Citations omitted, emphasis in original.) We recognized in *Paiz* that the law penalizes "conduct that constitutes a 'wanton disregard' for the nonbreaching party's rights, or 'bad faith,' with an award of punitive damages." *Id.* at 212, 880 P.2d at 309. Reading both instructions together clearly advised the jury that if it found that North River acted in bad faith, it also had to determine whether this constituted malicious, reckless, or wanton conduct before it could award punitive damages. The jury was adequately instructed on the issue of punitive damages.

{47} Secondly, the parties have filed supplemental briefs on the size of the punitive damages award, in which North River contends they are excessive under *BMW of N.A. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). That case involved BMW's policy that certain damaged cars would be repaired and sold as new if the repair cost did not exceed three percent of the suggested retail price, and the purchase for approximately $40,000 of a BMW by an Alabama plaintiff, which car had been partially repainted at a cost of about $600. Plaintiff's actual damages were $4,000 and after remittitur, he was awarded $2,000,000 in punitive damages, which was held by the United States Supreme Court to be grossly excessive and beyond the limitations of the

due process clause of the 14th Amendment to the U.S. Constitution, because 1) BMW's conduct was not particularly "reprehensible," *BMW*, 517 U.S. at 580, 116 S.Ct. 1589; 2) the amount of the punitive damages was unreasonably disproportionate to the amount of actual damages, *see id.* at 583, 116 S.Ct. 1589; and 3) the sanction was substantially greater than available statutory fines for similar misconduct. *See id.* at 585, 116 S.Ct. 1589.

{48} We hold that the punitive damages awarded by the jury in this case were not violative of the 14th Amendment. Unlike the situation in *BMW*, there was a finding of bad faith in this case as substantially supported by evidence of the failure of Crum and Forster/North River to control or disclose significant and material facts concerning the desperate state of affairs in the claims handling area. This included proof that Crum and Forster officials believed that poor claims handling had resulted in at least one apparently meritorious bad faith claim in an individual worker's compensation case being handled by Alexsis; that North River had performed an audit revealing that Alexsis' performance in claims handling was "far below company standards;" that Crum and Forster was seriously considering taking back the claims handling operation if there was little or no improvement in Alexsis' performance; that Alexsis' operation was "totally unacceptable;" and that Crum and Forster had reached the point where it could not tolerate the poor quality of service of Alexsis. This conduct took place with knowledge that an "incurred loss" premium arrangement existed between Crum and Forster and Allsup's, which meant that bad claims administration required increasingly higher contributions by Allsup's to reserves to cover the claims, thus increasing income to Crum and Forster. There should be no doubt that the jury, which had found that there was a contract for supervision of claims handling, had before it substantial evidence that Crum and Forster's failure to adequately supervise or disclose the facts was deserving of censure. There was also substantial evidence that the drawdown on the letter of credit occurred willfully and in bad faith without reference to whether the policy premiums to which the letter applied were overdue, to wit the letter

from Crum and Forster's attorney acknowledging that Letter of Credit No. 1478 applied to paid loss, not incurred loss, policies. The acts of North River can be considered to be reprehensible and affirmatively in bad faith, in contrast to the minor, relatively harmless and innocuous concealment in *BMW*.

{49} It is difficult to predetermine a due process standard when it comes to the ratio or proportion between compensatory and punitive damages. As the Court reiterated in *BMW*: "We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable. We can say, however, that [a] general concer[n] of reasonableness ... properly enters into the constitutional calculus." *BMW* at 582–83, 116 S.Ct. 1589. The Court noted that conduct resulting in relatively small compensatory damages awards could logically result in a high ratio of punitive damages where there is a particularly egregious act. In this case, the actual amount of the drawdown was $310,000, an amount used by the trial court as an offset on North River's counterclaim for unpaid premiums. As we discuss in more detail below, the fact that compensatory damages are balanced out or offset does not refute the fact that a substantial amount of damages existed initially which can be tied to a punitive award. Therefore, even though the *net figure* on the drawdown on the letter of credit was only $4,792, a punitive damages award of $500,000 was not constitutionally disproportionate. As to the proportionality of the claims handling damages, that is a ratio of $4,000,000 to $540,000, approximately 7.4 to 1, which easily bears constitutional scrutiny under *BMW* and *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 462, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993).

{50} Nor do we think that North River's legitimate expectation of sanctions as a result of its conduct was less than that which resulted. The intentional acts with which North River was charged parallel those described as unfair in the Insurance Code, NMSA 1978, § 59A–16–20(C) (1984). These intentional acts include failing to adopt and implement reasonable standards for the

prompt investigation and processing of insureds' claims arising under policies, which apparently for mere negligent violation is potentially punishable by a revocation of the license to sell insurance. NMSA 1978, § 59A–1–18 (1984). Finally, unlike *BMW,* there is no statutory fine for this or similar misconduct.

{51} Beyond the constitutional minimum, we have held that "[p]unitive damages do not have to be in reasonable proportion to actual damages, but they must not be so unrelated to the injury as to plainly manifest passion and prejudice rather than reason and justice." *Green Tree Acceptance, Inc.,* 108 N.M. at 174, 769 P.2d at 87. *Green Tree* involved the question of whether the punitive damages issue was properly before the jury and whether the jury correctly awarded such damages. We set forth the following procedural standard:

> Where a party prays for an award of punitive damages and the evidence is sufficient to permit the issue of punitive damages to be considered by the jury, the amount of such damages is left to the sound discretion of the jury based on the nature of the wrong, the circumstances of each case, and any aggravating or mitigating circumstances as may be shown.

{52} *Id.* As in *Green Tree,* we find here that due to the recklessness and bad faith of the defendant North River, the issue of punitive damages was properly sent to the jury. We further find that there was substantial evidence in the record to support the jury's award of punitive damages. As we said in looking at the issue from the point of view of whether the remittitur was proper, there is no evidence or claim that passion or prejudice, rather than reason and justice, influenced the jury in their awarding punitive damages.

{53} The final issue relating to punitive damages concerns the fact that North River was assessed compensatory damages in the amount of $540,000 as excessive premiums billed Allsup's, and Allsup's was assessed damages of $1,645,708 corresponding to unpaid premiums due North River. For its part, North River was assessed an additional $4,000,000 in punitive damages. North River therefore points out first that in most cases punitive damages cannot be recovered without compensatory damages having been awarded. *See Hudson v. Otero,* 80 N.M. at 671, 459 P.2d at 833. North River then reasons that since the total on compensatory damages sums out against Allsup's, there are in effect no compensatory damages on which to base punitive damages. This is to ignore the source and purpose of punitive damages. Liability and the existence of compensatory damages are an adequate basis for punitives, *Vickrey v. Dunivan,* 59 N.M. 90, 93, 279 P.2d 853 855 (1955), if there coexists a "culpable mental state" indivisible from the conduct constituting liability. *See McGinnis,* 110 N.M. at 9, 791 P.2d at 460. North River was found to be in bad faith in its breach of contract, and bad faith in turn is a culpable mental state. *See Bourgeous,* 117 N.M. at 438, 872 P.2d at 856.

{54} In this case, we have all the elements present that would naturally give rise to punitive damages—liability, compensatory damages suffered as a consequence of the liability, and a culpable mental state, or bad faith. The mere fact that compensatory damages were also assessed against Allsup's for failure to pay premiums does not erase any of these factors. The appropriateness of punitive damages is tied directly to the mental state underlying liability and the fact of actual damage. The fact that damages may be offset does not mean that they were not caused or that they never existed sufficiently to support a punitive damages award. Therefore, there was a complete basis on which to assess punitive damages against North River.

## IV. CONCLUSION

{55} To summarize, our principal holdings in this case are as follows: 1) that when a trial court grants a motion for remittitur or new trial in the alternative, a party may accept the remittitur "under protest" and appeal directly, with certain requirements set by the trial judge; 2) that the covenant of good faith and fair dealing may be enforced for a failure to disclose; and 3) that the jury award of punitive damages in the amount of

$4,500,000 was not unconstitutional or otherwise excessive.

{56}   For all of the above stated reasons, the judgment of the district court is affirmed in part and reversed in part.

{57}   **IT IS SO ORDERED.**

BACA, MINZNER, and SERNA, JJ., concur.

